**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ROBERT BIPLOVE TIMILSINA and BIG DADDY'S PIZZA RESTAURANT, LLC, a Utah limited liability company,<br><br>        Plaintiffs,<br><br>v.<br><br>WEST VALLEY CITY, a municipal corporation, and DOES 1-10,<br><br>        Defendants. | **REPORT AND RECOMMENDATION**<br><br>Case No. 2:14-cv-00046-DN-EJF<br><br>Judge David Nuffer<br>Magistrate Judge Evelyn J. Furse |

Plaintiffs Robert Biplove Timilsina and Big Daddy's Pizza Restaurant, LLC (jointly "Timilsina") seek a declaratory judgment finding West Valley City Municipal Code ("City Code") section 11-5-102 unconstitutional.  (Compl. 8, ECF No. 1.)  The parties filed cross-motions for summary judgment.  (ECF Nos. 19 & 21.)  The parties acknowledged at oral argument that section 11-5-102, while titled Temporary On-Premise Signs, governs all temporary signs as set forth in its opening paragraph—"Temporary signs shall conform to the following provisions"—without reference to on- or off-premises.  City Code § 11-5-102.

The undersigned[1] has carefully considered the Motions, Memoranda, and oral argument had on April 3, 2015.  For the reasons set forth below, the undersigned RECOMMENDS the Court DENY Timilsina's Motion for Summary Judgment and GRANT West Valley City's (the "City's") Cross-Motion for Summary Judgment because the City's prohibition of A-frame signs

---

[1] On June 9, 2014, Judge David Nuffer referred this case to the undersigned Magistrate Judge under 28 U.S.C. § 636(b)(1)(B).  (ECF No. 18.)

constitutes a permissible regulation on commercial speech meant to advance aesthetics and traffic safety.

## I. UNCONTESTED FACTS

On or about June 10, 2013, Timilsina placed an A-frame sign in an area in front of Timilsina's West Valley City restaurant.  (Pls.' Summ. J. Mot. Ex. A, ECF No. 19 at 22–25; City's Combined Mem. in Opp'n to Pls.' Summ. J. Mot. & in Supp. of the City's Own Separately Filed Cross-Mot.  ("Def.'s Summ. J. Mot.") Resp. to Pls.' Statement of Undisputed Material Fact ("Facts") ¶1, ECF No. 22.)  The Parties agreed at oral argument that Timilsina placed this sign off his property, and therefore the sign constitutes an off premise sign.  On July 7, 2013, the City issued Timilsina a $100 citation for violating City Code section 11-5-102(13).  (Pls.' Summ. J. Mot. Ex. A, ECF No. 19 at 22.)  Although the citation refers to subsection (13) as prohibiting A-frame signs, both parties refer to the apparently renumbered Code, which moved the relevant provision unaltered to subsection (14).  (*See, e.g.,* Pls.' Summ. J. Mot. 5, ECF No. 19; Def.'s Summ. J. Mot. 3, ECF No. 22.)  The citation includes a checkmark next to City Code section 11-5-102(13), which is now subsection (14), stating "[p]rohibited signs include:  A-frame, mobile, off premise, feathers, nongovernmental flags, streamers, and additional sign attached to an existing sign or fence, etc."  (Pls.' Summ. J. Mot. Ex. A, ECF No. 19 at 24.)  The issuing officer underlined the word "A-frame."  (*Id.*)  Section 11-5-102(14)(a) prohibits "A-frame signs … except if located in and as regulated in the City Center Zone."  (Def.'s Summ. J. Mot. Facts ¶ 5, ECF No. 22.)  Timilsina placed an A-frame sign between 3576 West 3500 South and a public sidewalk—outside the City Center Zone, (Pls.' Reply Add'l Facts ¶ 4, ECF No. 26)—advertising "$5.00 Pizza READY TO GO."  (Pls.' Summ. J. Mot. Ex. A, ECF No. 19 at 25.)  The sign contained "information that was truthful, not misleading, and advertised a lawful product and

activity." (Def.'s Summ. J. Mot. Facts ¶ 2; ECF No. 22.) Timilsina does not intend to erect any

other type of prohibited sign. (Pls.' Reply Add'l Facts ¶ 5, ECF No. 26.)

Timilsina focuses the Court's attention on nine exceptions to the prohibitions on

temporary signs listed in section 11-5-102:

> (1) New Development Signs used for any new development in any zone - subject
> to a size restriction of 32 square feet (City Code §11-5-102(5));
> (2) Grand-Opening Signs - allowed in all zones without size restriction (City
> Code §11-5-102(7));
> (3) New Subdivision and Home Sale Signs - allowed in all zones for subdivisions
> of 5 or more lots with a size restriction of 32 square feet in one area if one builder,
> a combined 128 square feet if multiple builders, all not to exceed 12' in height
> (City Code §11-5-102(10));
> (4) Open House Signs - "advertising real estate open for inspection for a
> prospective sale" and may include a "maximum of four (4) off premise open
> house signs" with each sign not to exceed eight (8) square feet (City Code §11-5-
> 102(11));
> (5) Other Temporary Signs - used for "*non-business* oriented banners whose sole
> intent is to *promote* festivals, holidays, seasons, or other community events..."
> without any size restriction (City Code §11-5-102(12)) (emphasis added);
> (6) Political Signs - allowed in all zones "relating to the nomination or election of
> any individual for public office or *advocacy of any issue* to be voted upon..." with
> a size restriction of 16 square feet if in a residential zone, otherwise there is no
> size restriction (City Code §11-5-102(13)) (emphasis added);
> (7) Sale, Rent or Lease Signs - allowed in all zones subject to a size restriction of
> eight (8) square feet in residential areas and thirty-two (32) square feet in non-
> residential zones (City Code §11-5-102(15));
> (8) Vehicle Signs - allowed in all commercial zones and applies if the sign
> exceeds four (4) square feet (City Code §11-5-102(16)); and
> (9) Window Signs - allowed in all non-residential zones and may provide a
> "maximum of 50% coverage of all windows" (City Code §11-5-102(17)).

(Pls.' Summ. J. Mot. 9–10, ECF No. 19.)

Title 11 of the City Code regulates all signage within the City. The ordinance describes

the City's governmental interests in a section titled "Purpose and Intent," saying:

> The City has developed the regulations set forth in this Title for the purpose of:
> (1) Limiting and/or reducing the visual clutter along City streets;
> (2) Encouraging good design and improved appearance by encouraging rapid
> replacement and eventual elimination of nonconforming or abandoned signs with
> the preferred sign types specified in this Ordinance;

(3) Implementing portions of the West Valley City Vision 2020 General Plan, to enhance the City's image and character;
(4) Reducing confusion and inattentive driving habits by requiring appropriate signage;
(5) Regulating all types of signs that are visible from the adjacent vehicular public right-of-way;
(6) Safeguarding and protecting property values;
(7) Promoting the public health, safety and the general welfare of the citizens of the City.

City Code § 11-1-102; (Pls.' Reply 5, ECF No. 26).  The undersigned appends a copy of Title 11, last revised August 20, 2014, taken from the City's website for clarity's sake.  (Appendix 1.)

## II. CONTESTED FACTS

Timilsina alleges in his Complaint and in his Motion that "several temporary and/or portable signs", similar to the sign at issue existed within close proximity.  (Compl. ¶ 10, ECF No. 1; Def.'s Summ. J. Mot. Facts ¶ 3, ECF No. 22.)  The City denies Timilsina's "characterizations of the signs and surrounding areas" in its Answer and Opposition.  (Ans. ¶¶ 8-10, ECF No. 6; Def.'s Summ. J. Mot. Facts ¶ 3, ECF No. 22.)  Timilsina did not verify his Complaint.  While "'[a] verified complaint may be treated as an affidavit for purposes of summary judgment,'" *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) (quoting *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) (per curiam)), an unverified complaint does not qualify as evidence in the summary judgment context, *Dodson v. Bd. of Cty. Comm'rs*, 878 F. Supp. 2d 1227, 1244 n.4 (D. Colo. 2012).  Thus Timilsina has failed to comply with Rule 56(c)'s requirement to support asserted facts by citation to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" with respect to the issue of similar signs in close proximity.  *See* Fed. R. Civ. P. 56(c)(1)(A).

Timilsina also alleged that "[p]ursuant to West Valley City Code § 11-5-102(15), real estate signs are exempt from the prohibition of WVCMC § 11-5-102."  (Def.'s Summ. J. Mot. Facts ¶ 6, ECF No. 22; *see also* Compl. ¶ 13, ECF No. 1.)  The City denied Timilsina's "characterizations of real estate signs as 'exempt' from prohibitions imposed by section 11-5-102".  (Def.'s Summ. J. Mot. Facts ¶ 6, ECF No. 22; *see also* Ans. ¶¶ 12-14, ECF No. 6.)  Section 11-5-102(15) reads as follows:

> (15) Sale, Rent, or Lease Signs
> > a.  Zoning Restrictions.  In all zoning districts, signs may be erected to advertise the sale, rent or lease of property upon which said signs are placed.
> > b.  Setback.  Signs shall be located on premise on the subject property.
> > c.  Size.  Signs shall not exceed an area of eight square feet in residential zones or 32 square feet in nonresidential zones.
> > d.  Number.  Said signs shall be limited to one sign per street frontage.

Plainly read, section 11-5-102(15) does not exempt real estate signs from section 11-5-102 as whole.  Section 11-5-102(15) places specific location, size, and number limits on temporary, on premise sale, rent, or lease signs.

### III. ANALYSIS

### A.  Motion for Summary Judgment

Courts may grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal quotation marks & citation omitted).  All material facts "will be deemed admitted unless specifically controverted by the statement of the opposing party identifying and citing to material facts of record meeting the requirements of Fed. R. Civ. P. 56."  DUCiv R 56-1.  The

parties agree the Court can resolve this case on summary judgment.  (Pls.' Reply 3, ECF No. 26; Def.'s Reply 2, ECF No. 28.)

**B.  Standing**

The City asserts Timilsina lacks standing to challenge the exceptions to the ordinance because all other people seeking to have a temporary off-premises A-frame sign face the same prohibition Timilsina does regardless of the other exemptions in the section.  (Def.'s Summ. J. Mot. 11-12, ECF No. 22.)  Thus, the City claims, Timilsina really challenges the prohibition on A-frame signs, not the exceptions to the regulations on temporary signs generally.  *(Id.)*

At oral argument, the City conceded that two exceptions to section 11-5-102(14)'s prohibition on A-frame signs exist.  The City permits temporary A-frame signs in the City Center Zone, section 11-5-102(14)(a), and A-Frame signs "used during a Grand-Opening," section 11-5-102(14)(g).

The Supreme Court recently reiterated the standing requirements in a free speech context: "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, – 573 U.S. ——, ——, 134 S. Ct. 2334, 2341 (June 16, 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).

**1.  Injury in Fact**

"An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted).  "[A] plaintiff could bring a preenforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and

there exists a credible threat of prosecution thereunder." *Id.* at 2342.  Timilsina has suffered a

concrete harm in the form of a $100 fine for displaying an A-frame sign.  However, Timilsina

has not alleged any intention to use any other type of prohibited sign and thus has not suffered an

injury from any portion of section 11-5-102 unrelated to A-frame signs.

 Section 11-5-102(14) prohibits certain temporary signs, including A-frame signs with the

two exceptions listed.  The parties agree the City cited Timilsina specifically for violating the

prohibition on A-frame signs found in section 11-5-102(14)(a).  (Pls.' Reply Add'l Facts ¶ 5,

ECF No. 26.)  Thus, Timilsina has shown an injury in fact to "conduct arguably affected with a

constitutional interest" as to section 11-5-102(14)(a), prohibiting temporary A-frame signs.

 The City contests that Timilsina has shown injury in fact from any other portion of

section 11-5-102, including the exemptions about which Timilsina complains.  (Def.'s Summ. J.

Mot. 11, ECF No. 22.)  The City states, and Timilsina does not contest, that section 11-5-

102(14)(a) prohibits an A-frame sign even if used in situations allowing for other temporary

signs:  real estate purposes (otherwise permitted by sections 11-5-102(5), (10), (11), (15)),

community events (otherwise permitted by section 11-5-102(12)), a political purpose (otherwise

permitted by section 11-5-102(13)), or on vehicles and in windows (otherwise permitted by

sections 11-5-102(16) and (17)).  *See id.* (discussing some but not all of the exemptions).

Because the ordinance prohibits the A-frame sign in all of these contexts, the Court agrees with

the City that Timilsina's injury in fact comes only from the prohibition on A-frame signs, not

from the other exceptions with which Timilsina takes issue.

 That Timilsina does not assert any intention to erect any other type of prohibited sign

reinforces this conclusion.  (*See* Pls.' Reply Add'l Facts ¶ 5, ECF No. 26.)  Absent an actual

enforcement action or the intention to engage in a statutorily prohibited course of conduct,

Timilsina lacks standing to challenge portions of section 11-5-102 unrelated to A-frame signs or the sign ordinance as a whole.  Because Timilsina insists on having an A-frame sign and has no intention of having any other type of prohibited sign, any ruling on the other exceptions would not ameliorate his concern—the ability to have an A-frame sign.  For this reason, Timilsina cannot allege injury in fact as to any provision of section 11-5-102 unrelated to A-frame signs.  Absent such a showing, Timilsina lacks standing to challenge those other exceptions to section 11-5-102.

### 2. Causal Connection

A causal connection exists between the injury asserted and the offending ordinance if the court finds the injury "'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).  In this case, the parties agree that the City cited and fined Timilsina pursuant to section 11-5-102(14).  Thus the causal connection between the offending section and Timilsina's injury remains beyond dispute.

### 3. Redressability

The City further argues that Timilsina lacks standing as to the A-frame provision because the relief sought will not redress the harm alleged.  (Def.'s Summ. J. Mot. 12, ECF No. 22.)  Specifically, striking the exceptions to the prohibition on A-frame signs in section 11-5-102(14) would not allow Timilsina to display his sign; it would simply prohibit those who previously displayed the exempted signs from displaying them in the future.  Furthermore, even striking section 11-5-102 altogether would not allow Timilsina to display his sign because the sign ordinance prohibits off premise signs generally unless an exception exists, and no exception

permitting off premise A-frame signs would exist if the Court struck section 11-5-102.  *See* City

Code § 11-1-103 (stating "sign types not specifically allowable as set forth within this Title shall

be prohibited").  Therefore, the City argues, the relief requested will not redress the injury.

First Amendment jurisprudence refers to a challenge to statutory exemptions as an

underinclusiveness claim.

> While surprising at first glance, the notion that a regulation of speech may be
> impermissibly *underinclusive* is firmly grounded in basic First Amendment
> principles.  Thus, an exemption from an otherwise permissible regulation of
> speech may represent a governmental "attempt to give one side of a debatable
> public question an advantage in expressing its views to the people."

*City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (footnote and citation omitted).  If the

redressability prong of the standing test required removal of the exemptions to benefit the

challenger, such a requirement "would effectively insulate underinclusive statutes from

constitutional challenge, a proposition [the U.S. Supreme Court] soundly rejected."  *Ark. Writers'*

*Project, Inc. v. Ragland*, 481 U.S. 221, 227 (1987) (citing *Orr v. Orr*, 440 U.S. 268, 272 (1979)).

One exception to the prohibited temporary signs listed in section 11-5-102(14) exists at

subsection (g).  It states:  "g.  Exceptions.  Any type of sign may be used during a Grand-

Opening, as defined in this Chapter."  Thus, Timilsina would seem to assert that the City

discriminates between its content (sales) and other content (grand openings).  Specifically, if

Timilsina advertised a sale within thirty days of obtaining a business license, he could use an off

premise A-frame sign, but because he advertised a sale after that date, he could not use an off

premise A-frame sign.

In this case the exemption within section 11-5-102(14) causes a distinction between

permissible signage that may cause legal injury to Timilsina if the distinction does not pass

constitutional muster, because had Timilsina qualified for the exception, he could have displayed

his sign.  Thus, striking of the exception would level the playing field between Timilsina and

other speakers, redressing the problem about which Timilsina complains. Under this analysis, Timilsina has made an underinclusiveness claim sufficient to show redressability as to the A-frame sign prohibition. To the extent the Court must refer to other portions of the section or the ordinance to understand the provision at issue, Timilsina has standing to seek review of those portions.

To the extent Timilsina's briefing suggests he challenges the entire City sign ordinance, (Pls.' Reply 4-5, ECF No. 26), Timilsina's Complaint only challenges the constitutionality of section 11-5-102, (Compl. 8, ECF No. 1), and Timilsina affirmed at oral argument that he only challenges section 11-5-102. Thus, any challenge to the entire sign ordinance exceeds the scope of the Complaint and these summary judgment motions.

Therefore, the undersigned RECOMMENDS the District Court find Timilsina has standing to challenge section 11-5-102(14), but not section 11-5-102 as whole.

## C.  First Amendment Challenge to Section 11-5-102(14)

Timilsina argues section 11-5-102(14) does not constitute a valid time, place, and manner restriction and that it fails the Supreme Court's *Central Hudson* test limiting commercial speech restrictions. (Pls.' Summ. J. Mot. 7–18, ECF No. 19 (*citing Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980)).) The City responds by arguing section 11-5-102(14) does constitute a valid content-neutral time, place, and manner restriction narrowly tailored to serve substantial government interests. (Def.'s Summ. J. Mot. 11–28, ECF No. 22.) In the alternative, the City asserts section 11-5-102(14) complies with *Central Hudson*'s requirements. *Id.* at 22–28.

Judicial evaluations of First Amendment free expression claims "begin with the venerable principle that '[e]ach medium of expression ... must be assessed for First Amendment purposes

by standards suited to it, for each may present its own problems.'" *Arlington Cty. Republican Comm. v. Arlington Cty.*, 983 F.2d 587, 591 (4th Cir. 1993) (*quoting Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, (1975)) (alterations in original).  Faced with "the problem of applying the broad principles of the First Amendment to unique forums of expression," the Supreme Court has developed an array of tests applicable to different circumstances. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 500 (1981) (plurality opinion) (citing cases reviewing billing envelope inserts, picketing in residential areas, solicitation, outdoor movie theaters, and advertising on city-owned transit).[2]

The Supreme Court has held that "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation,'" that merits First Amendment protection under certain conditions. *Cent. Hudson*, 447 U.S. at 564 n.6, 566 (quoting *Bates v. State Bar of Arizona*, 433 U.S. 350, 381 (1977)).  Specifically, the Supreme Court stated "[t]he Constitution . . .  accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 562-63.

Timilsina asserts that the time, place, and manner test applies to commercial speech regulations directed at the form of the speech but that the *Central Hudson* test applies to commercial speech regulations directed at the content of the speech, citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771-73 (1976) and *Central Hudson*. *Metromedia*, 453 U.S. at 507, decided after both of these cases, refutes this contention, acknowledging the Supreme Court adopted the *Central Hudson* test to "determin[e] the validity

---

[2] While the *Metromedia* decision generally is a plurality, Parts I through IV, spanning pages 493 to 512 garnered a majority opinion, given Justice Stevens's concurrence.  453 U.S. at 541 (J. Stevens dissenting in part).  This Report and Recommendation cites only to these pages.

of government restrictions on commercial speech as distinguished from more fully protected speech." *See accord Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1236-37 (10th Cir. 2004) (applying *Central Hudson* test). Neither the *Central Hudson* test nor subsequent cases applying it make any attempt to first distinguish whether the restriction relates to form or content before deciding which test to apply. As set forth above, because the parties agree this regulation concerns commercial speech, the Court applies the *Central Hudson* test.

Because the parties agree this case concerns commercial speech and the *Central Hudson* applies, the Court need not address how the regulation would fare under the recent Supreme Court case, *Reed v. Town of Gilbert*, No. 13-502, 576 U.S. __, 2015 WL 2473374 (June 18, 2015), and the time, place, or manner test. *See accord*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554-55 (2001) (noting "we see 'no need to break new ground. *Central Hudson,* as applied in our more recent commercial speech cases, provides an adequate basis for decision.'") (quoting *Greater New Orleans Broad. Assn. v. United States*, 527 U.S. 173, 184 (1999)).

For commercial speech to come within First Amendment protection, it must concern lawful activity and not mislead. *Cent. Hudson*, 447 U.S. at 566. The parties concede the commercial speech at issue concerns lawful activity and does not mislead. (Def.'s Summ. J. Mot. Facts ¶2, ECF No. 22.) The parties also agree the government's asserted interests in regulation qualify as substantial. (Pls.' Summ. J. Mot. 11, ECF No. 19; Def.'s Summ. J. Mot. 22, ECF No. 22.) The last two prongs of *Central Hudson* present the dispute in this case: the regulation must directly advance the asserted interest and not prohibit any more speech than necessary to serve that interest. *Cent. Hudson*, 447 U.S. at 566. "The government bears the burden of asserting one or more substantial governmental interests and demonstrating a

reasonable fit between those interests and the challenged regulation." *Mainstream*, 358 F.3d at 1237.

### 1.    The Ordinance Directly Advances the Asserted Governmental Interests

The City prohibits A-frame signs for traffic safety and aesthetic purposes as set forth in section 11-1-102.  The City allows A-frame signs in one area—the City Center Zone.  City Code § 11-5-102(14)(a).  The City also allows A-frame signs elsewhere during a limited period— "thirty (30) days from the issuance date of a business license."  City Code § 11-5-102(14)(g) & (7)(d).  Timilsina asserts the exceptions so undermine the City's stated interests in promoting traffic safety and aesthetics that they prevent the ordinance from advancing the asserted governmental interests.  (Pls.' Summ. J. Mot. 12-15, ECF No. 19.)  The Court disagrees.

*Central Hudson* requires that the speech restriction directly advance the stated goal.  447 U.S. at 566.  In *Central Hudson*, the Supreme Court found a prohibition on utility advertisements sufficiently related to the state's interest in conserving energy because a "direct link" between the restriction and the interest existed from the "immediate connection between advertising and demand for electricity."  447 U.S. at 569.

In support of his arguments, Timilsina cites *Rubin v. Coors Brewing Co*, where the Supreme Court struck down a law banning disclosure of alcohol content on beer labels but allowing such disclosures on wine or spirits labels.  514 U.S. 476, 488 (1995).  The Court held "the irrationality of this unique and puzzling regulatory framework ensures that the labeling ban will fail to achieve" the state's asserted objective in "supress[ing] strength wars".  *Id.* at 489.

Timilsina also cites *Greater New Orleans*, where the Supreme Court struck down a federal statute prohibiting advertising for legal gambling in certain circumstances because the

statute's exceptions undermined the statute's asserted objective.  527 U.S. at 190.  With these

cases in mind, the undersigned considers Timilsina's underinclusiveness argument.

The City Code contains the governmental interests behind its sign ordinance,

collectively referred to as "traffic safety and aesthetics":

> (1) Limiting and/or reducing the visual clutter along City streets;
> (2) Encouraging good design and improved appearance by encouraging rapid
> replacement and eventual elimination of nonconforming or abandoned signs with
> the preferred sign types specified in this Ordinance;
> (3) Implementing portions of the West Valley City Vision 2020 General Plan, to
> enhance the City's image and character;
> (4) Reducing confusion and inattentive driving habits by requiring appropriate
> signage;
> (5) Regulating all types of signs that are visible from the adjacent vehicular public
> right-of-way;
> (6) Safeguarding and protecting property values;
> (7) Promoting the public health, safety and the general welfare of the citizens of
> the City.

City Code § 11-1-102.

Timilsina has asked the Court to demand proof in the form of studies proving that A-

frame signs are aesthetically displeasing or an impediment to traffic safety.  The Supreme Court

has specifically rejected such a requirement:

> We do not, however, require that "empirical data come . . . accompanied by a
> surfeit of background information . . . .  [W]e have permitted litigants to justify
> speech restrictions by reference to studies and anecdotes pertaining to different
> locales altogether, or even, in a case applying strict scrutiny, to justify restrictions
> based solely on history, consensus, and 'simple common sense.'"  *Florida Bar v.
> Went For It, Inc.,* [515 U.S. 618, (1995)] at 628, 115 S. Ct. 2371 (citations and
> internal quotation marks omitted).

*Lorillard*, 533 U.S. at 555; *see also Mainstream*, 358 F.3d at 1237 (noting "a commercial speech

regulation may be justified by anecdotes, history, consensus, or simple common sense").  Of

course, "'mere speculation or conjecture'" will not satisfy the City's burden either.  *Rubin*, 514

U.S. at 487 (citation omitted).  No one can question that "the state may legitimately exercise its

police powers to advance esthetic values," *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984), and that aesthetic values are inherently subjective. *Metromedia,* 453 U.S. at 510. Similarly, local governments have regulated signs based on their relationship to traffic safety for years, and

> "[the Court] would be trespassing on one of the most intensely local and specialized of all municipal problems if [it] held that this regulation had no relation to the traffic problem . . . . It is the judgment of the local authorities that it does have such a relation. And nothing has been advanced which shows that to be palpably false."

*Id.* at 509 (quoting *Ry. Express Agency Inc. v. New York*, 336 U.S. 106, 109 (1949)).

Nothing in the record suggests that the City's goals in eliminating A-frame signs come from an ulterior motive of suppression of speech. The Purpose and Intent section specifically acknowledges an intent to favor some sign types over others: "Encouraging good design and improved appearance by encouraging rapid replacement and eventual elimination of nonconforming or abandoned signs with the *preferred sign types* specified in this Ordinance," and "Reducing confusion and inattentive driving habits by requiring *appropriate signage*." City Code § 11-1-102(2) & (4). When examining the entire sign ordinance, one can see that it generally disfavors A-frame signs: section 11-4-113(1) prohibits on premise mobile signs "such as an 'A' frame," and section 11-5-102(14) prohibits temporary A-frame signs. The Court accepts the ordinance's proposition that A-frame signs are aesthetically displeasing and adverse to traffic safety based on the pronouncement of purpose and the extensive prohibition of such signs in the ordinance.

Nonetheless, pervasive exceptions to an ordinance may vitiate the stated goals, making the ordinance constitutionally underinclusive. *See Rubin*, 514 U.S. at 488-90 (noting exceptions make the stated purpose of the legislation unattainable). Turning to the exceptions, the Court

15

must determine whether they so undermine the goals of prohibiting the aesthetically displeasing

signs and signs that impair traffic safety that they frustrate those goals.  As an initial matter,

"First Amendment challenges based on underinclusiveness face an uphill battle in the

commercial speech context."  *Mainstream*, 358 F.3d at 1238.

      The first exception allows A-frame signs in the City Center while prohibiting them

elsewhere in the City.  The City Code, through zoning, has created the City Center as "the

recognizable center" of the City, with a different visual quality and traffic plan than the other

portions of the City.  The City has explained the purpose of the City Center Zone as follows:

> The purpose of the City Center Zone is to:
> (1) Implement the goals set forth in the Fairbourne Station Vision within the General Plan.
> (2) Create a recognizable center or downtown for West Valley City.
> (3) Encourage and direct development that supports transit.
> (4) Encourage infill and redevelopment near the transit station by City Hall.
> (5) Create new opportunities for economic growth and redevelopment.
> (6) Reinforce the use of public transportation by locating higher-intensity development, including employment-oriented businesses and higher density residential uses, adjacent to transit stops.
> (7) Encourage mixed-use development to reduce automobile dependency and roadway congestion by combining trips and locating destinations within walking and biking distances – all interconnected with transit.
> (8) Enhance neighborhood identity by creating more choices such as walking, biking and shopping to residents that promote safety, friendliness and livability.
> (9) Provide a mix of housing types, costs and densities.
> (10) Promote architectural and site design treatments that enhance the visual appearance of development within the Zone.

City Code § 7-6-1601.

      The allowance of A-frame signs in the City Center reflects one way in which the City

Council has allowed that section of the City to differ from other areas.  Permitting A-frame signs

in the City Center does not detract from the City's asserted objectives to the degree that it

undermines them.  Rather, the permission suggests the City thinks A-frame signs in the City

Center may aid in the visual distinction of that neighborhood.  Additionally, the City may have

16

fewer concerns with the A-frame sign's  impact on traffic safety in the City Center since it wants to increase use of public transportation, walking, and biking in that area.

The second exception permits a person to display an A-frame sign in the thirty days after obtaining a business license.  City Code § 11-5-102(7) & (14)(g).  This exception allows A-frame signs for a short, explicitly limited period—thirty days.  The exception further limits the use of A-frame signs to people receiving a new business license.  By carefully limiting both the period and those eligible to display such signs, the City Council has made sure that A-frame signs will rarely appear outside of the City Center and then only briefly.

While at first blush the "Grand Opening" exception would appear to turn on content, further examination makes clear the ordinance defines a "Grand-Opening Sign" by its temporal proximity to the issuance of a business license not by the content of the sign.  City Code § 11-5-102(7) & 14(g).  Consequently, this provision prefers some speakers (new business licensees) to other speakers (everyone else).  However, a speaker preference does not require strict scrutiny unless the "speaker preference reflects a content preference."  *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 658 (1994), *approved by Reed,* No. 13-502, slip op. at 13, 576 U.S. at __.  As noted, the ordinance places no restrictions on the content of the sign a new business licensee erects. City Code § 11-5-102(7) & (14)(g).  The City stated at oral argument, and Timilsina did not deny, that a new business licensee could put any message on the sign s/he wishes; it need not advertise a "Grand Opening" at all.  For this reason, the Court finds the provision devoid of a content preference and does not need to analyze this exception under strict scrutiny.

Unlike in *Greater New Orleans*, where the Supreme Court noted the inconsistency between Congress's asserted desire to curb the evils of gambling with "Congress' simultaneous encouragement of tribal casino gambling," the City's Grand Opening exception is not inherently

contradictory.  *See Greater New Orleans*, 527 U.S. at 189.  Permitting people to display signs for thirty days following the issuance of a business license does not suggest it finds A-frame signs aesthetically pleasing or not adverse to traffic safety.  Rather the exception suggests that for a very limited time, the City will permit an exception.  That willingness, however, does not reach so deeply as to undermine the "direct link" between the restriction and the interest.  *See, e.g., Metromedia,* 453 U.S. at 511-12 (acknowledging accommodation reached between zoning goals and aesthetic/traffic safety goals did not undermine direct link).  "The underinclusiveness of a commercial speech regulation is relevant only if it renders the regulatory framework so irrational that it fails materially to advance the aims that it was purportedly designed to further." *Mainstream*, 358 F.3d at 1238-9.

Thus while in *Rubin*, 514 U.S. at 489, "the irrationality of this unique and puzzling regulatory framework ensures that the labeling ban will fail to achieve that end," the two exceptions in this case reflect circumscribed exceptions that do not completely undercut the City's stated goals.  The exceptions in this case align more closely with the distinction between onsite and offsite advertising approved in *Metromedia*, 453 U.S. at 511-12.  Whether exceptions exist does not change the fact that the regulation relates to the stated goal.  *See id.* at 511 ("In the first place, whether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics.").  In addition, the City may believe A-frame signs in the City Center or the occasional grand opening sign, present less of a problem than ubiquitous A-frame signs.  *See id.* at 511 ("Second, the city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising.").  The City may also allow commercial speech in the form of A-frame signs in the City Center and following the obtaining of a new business license because it has decided

18

that commercial speech through an A-frame at those places or times trumps the City's interests in traffic safety and aesthetics.  *Id.* at 512 ("The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics.").

The City has met its burden of demonstrating a direct link between the stated goals—traffic dangers and aesthetic degradation—and the restriction on A-frame signs.  The City has also met its burden of showing the exceptions to the restriction do not undermine the restriction to such a degree so as to render it insufficiently related to its objectives.  Therefore, the City has satisfied *Central Hudson*'s third prong.

### 2. The Ordinance Does Not Prohibit More Speech than Necessary to Serve the City's Interests

*Central Hudson*'s final prong requires the undersigned to analyze whether the City's A-frame sign ban prohibits more speech than necessary to serve its interests in promoting traffic safety and enhancing aesthetics.  *See Cent. Hudson*, 447 U.S. at 566.  Timilsina argues "[t]he regulatory scheme presented by the City through its Ordinance does not consist of a reasonable fit between the regulation and the given interests."  (Pl.'s Summ. J. Mot. 17, ECF No. 19.)  The City, Timilsina contends, has overreached by banning "any cost effective signs."  *Id.*  The Court disagrees.

To satisfy *Central Hudson*'s final prong, courts consider the overinclusiveness of the restriction:

> [t]he Government is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.

*Greater New Orleans*, 527 U.S. at 188 (quotation marks and citations omitted); *see also Nat'l Adver. Co. v. City & Cty. of Denver*, 912 F.2d 405, 409 (10th Cir. 1990) ("A narrowly tailored regulation which does not burden substantially more speech than is necessary to further the government's legitimate interests will suffice." (quotation marks and citations omitted)).

The Court must determine whether the City's A-frame prohibition restricts more speech than necessary to achieve its stated aims. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002). The City's A-frame restriction has a very narrow reach, and Timilsina's claims of overinclusiveness fall short.

Section 11-5-102(14)(a) prohibits one temporary sign design that the City has deemed especially distasteful and/or harmful—the A-frame. Businesses have the opportunity to communicate their messages through a variety of temporary sign alternatives set forth in section 11-5-102. Indeed, Timilsina has taken full advantage of his opportunities to advertise five-dollar pizza. (*Cf.*, Pls.' Summ. J. Mot. Ex. A, ECF No. 19 at 25 (showing photograph of A-frame sign in dispute); Def.'s Summ J. Mot. Ex. A, ECF No. 23-1 (showing photographs of multiple signs advertising Timilsina five-dollar pizza).) Moreover, nothing in section 11-5-102(14) prohibits Timilsina from advertising five dollar pizza via Twitter, Facebook, flyer, newspaper, radio, television, etc. Because section 11-5-102(14)(a) affects only a sliver of potential speech—and only a tiny portion of potential signage—it does not prohibit substantially more speech than necessary to serve its interests. *See Nat'l Adver.*, 912 F.2d at 409 (approving of regulations that do "not burden substantially more speech than … necessary to further the government's legitimate interests" (quotation marks and citations omitted)). Advertisers do not have an unlimited right to choose their medium of expression when other alternatives, even if more expensive, exist. *See Taxpayers for Vincent*, 466 U.S. at 812 n.30 (citing *Kovacs v. Cooper*, 336

U.S. 77, 88-89 (1949) ("That more people may be more easily and cheaply reached by sound trucks, perhaps borrowed without cost from some zealous supporter, is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open.")).  The A-frame restriction represents the City Council's determination that A-frame signs, because of their shape, placement, and temporary nature, pose a special risk to the community.

Additionally, in considering whether the City narrowly tailored the ordinance, the Supreme Court has instructed "if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 418 n.13 (1993).  Notably, Timilsina makes no suggestion of other *less*-burdensome alternatives to the A-frame restriction.  Instead, Timilsina argues that if the City really intended to protect aesthetics and traffic safety, it would ban all signs or at least all temporary signs.  (Pls.' Summ. J. Mot. 18, ECF No. 19.)  But a ban on all signs or even all temporary signs burdens more speech, not less.  The City prohibits a specific sign type—the temporary A-frame sign—it deems unattractive and/or unsafe.  Under these circumstances, the City employed a reasonable way to limit the harm—prohibit A-frame signs.  Only a restriction on the placement and duration of A-frame signs can effectively achieve the City's goals.  *See Metromedia*, 453 U.S. at 508 ("If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them.")

Timilsina asserts, presumably in reliance on *City of Cincinnati,* 507 U.S. at 428, that all signs equally cause aesthetic displeasure and harm traffic safety, and thus any law allowing some

types of signs and restricting others fails to advance aesthetic and safety goals sufficiently to pass

constitutional muster.  (Pls.' Summ. J. Mot. 18, ECF No. 19.)  *City of Cincinnati,* 507 U.S. at

425, found the challenged ordinance did not advance aesthetic goals because the prohibited

"newsracks are no greater an eyesore than the newsracks permitted."

 However, the undersigned cannot conclude based on this record that A-frame signs

present the same aesthetic or traffic problems as other types of signs.  Timilsina's argument

completely ignores the City Council's obvious disagreement with that proposition as evidenced

by its allowing some types of signs and prohibiting others.  *See* City Code § 11-5-102

(delineating allowable and prohibited temporary signs) & § 11-2-102 (stating the purpose and

intent of the sign ordinance).  Timilsina fails to put forth any evidence suggesting the City

Council did not find A-frame signs more distasteful than banners, for example.  Similarly,

Timilsina does not present evidence showing that A-frame signs present the same traffic hazards

as other signs, say those at eye level.  Without contrary evidence, the undersigned will not

second-guess the City's stated purposes embodied in the actual sign ordinance on matters as

inherently subjective as aesthetics and as fundamentally local as traffic.  *See Metromedia,* 453

U.S. at 510 (noting subjective nature of aesthetic judgments) & 509 (noting refusal to discount

local authorities' judgments re traffic absent some evidence that such judgment was "palpably

false").

 Furthermore, the exceptions to the A-frame prohibition also work in favor of a finding of

reasonable fit.  The City has identified limited circumstances that do not completely undercut the

ban's purpose in which people can use A-frame signs—a certain section of the City and within

thirty days of obtaining a business license.  These exceptions demonstrate an attempt on the

City's part not to foreclose that means of communication completely and thus narrowly tailor its ordinance.

This case differs from *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996), (addressing advertising of liquor prices) and *Thompson*, 535 U.S. at 371-73 (addressing advertising of compounded drugs), where the regulations at issue tried to remedy a harm caused by the content of the advertising not the actual medium.  Unlike *44 Liquormart*, at 507–08, and *Thompson*, at 372, price controls and sales volume limits applied to A-frame signs could not as effectively achieve the desired end.  The City cannot enact an economic or regulatory framework that would reduce the harm imposed by A-frame signs as effectively as the existing prohibition.

 By narrowly constructing a restriction targeting one category of signage deemed harmful to traffic safety and aesthetic considerations, the City Council abided by *Central Hudson*'s restrictions and barred no more speech than necessary to accomplish its objectives.  *See Cent. Hudson*, 447 U.S. at 566.

Because section 11-5-102(14)(a) directly advances the City's interests in traffic safety and aesthetics and prohibits no more speech than necessary to advance those interests, the undersigned RECOMMENDS the District Court find the prohibition complies with *Central Hudson*'s requirements.

## D. Facial Challenge to the Sign Ordinance

Timilsina's Complaint also challenges section 11-5-102(14)(a), alleging a facial violation of the freedom of expression guaranteed by the First Amendment.  (*See* Compl. 8, ECF No. 1).  To make a facial challenge to an ordinance when the application of the law to the case proves valid, the challenger must convince the court that "the statute's very existence will inhibit free expression."  *Taxpayers for Vincent*, 466 U.S. at 799.  "[T]he overbreadth of a statute must not

only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* 799-800 (quoting *Broadrick v. Okl.*, 413 U.S. 601, 615 (1973)). In deciding whether a case qualifies for a facial challenge under the overbreadth doctrine, courts must exercise care to prevent the doctrine from "sweep[ing] so broadly that the exception to ordinary standing requirements would swallow the general rule." *Id.* at 799.

The undersigned does not find substantial overbreadth in considering this case. While section 11-5-102(14)(a) applies to non-commercial speech as well, and thus a court would consider a challenge involving non-commercial speech under a different analysis, the Court does not find that the prohibition on A-frame signs substantially inhibits the speech of third parties not before the Court, given the wide variety of avenues available for speaking.

Significantly, Timilsina does not address his facial challenge in any of his briefing. Timilsina only challenges section 11-5-102's application to commercial speech. (Pls.' Summ. J. Mot. 2, ECF No. 19 ("The ordinance contains improper time, place and manner restrictions for commercial speech. In addition, it is drafted so as to favor one business type over another.") On this basis, the undersigned finds Timilsina's facial challenge abandoned and recommends DISMISSING it.

## IV. RECOMMENDATION

For the reasons set forth above, the undersigned Magistrate Judge RECOMMENDS the District Judge GRANT the City's Motion for Summary Judgment (ECF No. 21) and DENY Timilsina's Motion for Summary Judgment (ECF No. 19).

The Court will send copies of this Report and Recommendation to all parties, who are hereby notified of their right to object. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The parties must file any objection to this Report and Recommendation within fourteen (14) days of

service thereof.  *Id.*  Failure to object may constitute waiver of objections upon subsequent

review.

Dated this 30th day of June 2015.

BY THE COURT:

_____
Evelyn J. Furse
United States Magistrate Judge

# TITLE 11
# SIGN ORDINANCE

Chapters:

11-1     General Provisions
11-2     Application of Regulations
11-3     Enforcement
11-4     General Sign Requirements
11-5     Specific Sign Regulations
11-6     Sign Requirements by Zoning District
11-7     Nonconforming Signs

# CHAPTER 11-1
# GENERAL PROVISIONS

Sections:
11-1-101.        Short Title.
11-1-102.        Purpose and Intent.
11-1-103.        Interpretation.
11-1-104.        Definitions.

## 11-1-101.    SHORT TITLE.

The Title shall be known as the "West Valley City Sign Regulation Ordinance."  This Title shall also be known as "Title 11, West Valley Code."  It may be cited and pleaded under either designation.

## 11-1-102.    PURPOSE AND INTENT.

The City has developed the regulations set forth in this Title for the purpose of:
(1)  Limiting and/or reducing the visual clutter along City streets;
(2)  Encouraging good design and improved appearance by encouraging rapid replacement and eventual elimination of nonconforming or abandoned signs with the preferred sign types specified in this Ordinance;
(3)  Implementing portions of the West Valley City Vision 2020 General Plan, to enhance the City's image and character;
(4)  Reducing confusion and inattentive driving habits by requiring appropriate signage;
(5)  Regulating all types of signs that are visible from the adjacent vehicular public right-of-way;
(6)  Safeguarding and protecting property values;
(7)  Promoting the public health, safety and the general welfare of the citizens of the City.

**(Ord. 01-50, Amended, 07/03/2001)**

## 11-1-103.    INTERPRETATION.

In interpreting and applying the provisions of this Title, the sign area requirements contained herein are declared to be the maximum allowable for the purpose set forth.  The type of signs allowable by this Title are fully described and sign types not specifically allowable as set forth within this Title shall be prohibited.  This Title shall not nullify the more restrictive provisions of covenants, agreements, easements, deed restrictions, ordinances, or laws, but shall prevail over such provisions which are less restrictive.

## 11-1-104.    DEFINITIONS.

In this Title, the terms, phrases, words and their derivatives shall have the meaning as stated and defined in this Chapter.  When not inconsistent with the context, words used in the present tense include the future, words in the plural number include the singular number, and words in the singular number include the plural number.  Words not herein defined, but defined in the Building Code or in Title 7 of the Zoning Ordinance which has been adopted by the City shall be construed as defined.

(1) Brightness means the number of lumens that pass through a sign's pixels or light bulbs.

(2) Brightness for electronic message signs is measured in NITs or candela per square meter.

(3) Building Face or Wall means all window and wall area of a building in one plane or elevation.

(4) Building Inspector means the appropriate inspectors employed by the City vested with the responsibility of enforcing the International Building Code, and all other applicable ordinances as necessary for adequate performance of his vested powers.

(5) Building Line means the line formed by the intersection of the vertical plane of the building with the ground plane.

(6) Building, Front Line of means the line of the face of the building or structure nearest the front line of the lot.  This face includes sun parlors, bay windows, covered and/or uncovered porches, whether enclosed or open, but does not include uncovered steps less than four feet above grade and eaves overhanging less than two feet.

(7) Commercial Complex means a group of two or more commercial businesses in one or more freestanding buildings sharing parking, circulation, etc. and which is approved as a part of an overall site plan.  For the purposes of this Title, planned commercial developments and commercial condominium projects are considered commercial complexes.

(8) Copy means the wording on the display surface of a sign.

(9) Community Development Director means the Director of the Community and Economic Development Department of the City.

(10) Designee means those persons employed by the City and assigned by the Community Development Director or Zoning Administrator to perform appropriate duties as described in this Title.

(11) Display Surface means the surface made available by the sign structure for the mounting of material to advertise or promote a product, event, person or subject.

(12) Illegal Sign means any sign found to violate any of the City Ordinances and determined to not be a conforming sign.

(13) Landscaping means any combination of living plants such as trees, shrubs, annuals, perennials, turf or ground cover.

(14) Lot, Corner means a lot abutting on two intersecting streets, where the interior angle of intersection is less than 135 degrees.

(15) Nonconforming Sign or Sign Structure means a sign or sign structure or portion thereof lawfully existing at the time this Title became effective, which does not conform to all height, area, yard regulations or other requirements of this Title as prescribed in the zone in which it is located.

(16) Non-maintained or Abandoned Sign means a sign in poor condition displaying peeling paint, rust, and/or other evidence of neglect, or signs not advertising a current, active business. "Active business" means a business holding a current West Valley City Business License.

(17) Sign means and includes every advertising message, announcement, declaration, demonstration, merchandise display, illustration, insignia, surface or space erected or maintained in view of the observer thereof for identification, advertisement or promotion of the interests of any person, entity, product or service.  The definition of sign shall also include the sign structure, supports, lighting system and any attachments, ornaments or other features used to draw the attention of observers.  The use of overly bright or garish colors such as bright orange, bright yellow, bright blue, bright red, or bright green, on the building, shall be considered as having sign value and shall be considered under the sign area requirement. This definition does not include any flag, badge or ensign of any government or governmental agency erected for and used to identify said government or governmental agency.

(18) Sign, Animated means a sign that involves motion or rotation of any part by mechanical or artificial means or displays rapidly flashing or intermittent lights.  Sign motion means any

passing from one place to another with a continuous movement.  Sign rotation means faces or portions of a sign face that revolve around a central axis.  Rapidly flashing sign means lights that turn on and off more than once every second.  Intermittent flashing sign means lights that turn on and off no more than once every two seconds.  Lights that turn on and off at an interval greater than two seconds shall not have light bulbs, or, for neon signs, light that exceeds 25 watts.

    a. Electronic message signs may use static or animated animation. Electronic message signs shall not use full video animation except as provided in Subsection (18)b below.

        i. Static Animation means text or images that have no motion. Text and/or images shall not fade, scroll, rotate or use any sort of motion.

        ii. Animated Animation means a message is displayed for a minimum of six (6) seconds and fades, for duration of at least three (3) seconds into the subsequent message. Text and/or images shall not scroll.  Freeway oriented signs may be displayed for a minimum of three (3) seconds, and fades or scrolls into the subsequent message.

        iii. Video Animation means simulated movement created by the display of a series of pictures or frames, creating the illusion of continuous movement, where video clips or simulated video clips are displayed.

    b. Electronic message signs may use full video animation if the following conditions are met:

        i. Signs with video animation must be located at least 400' from any public right-of-way.

        ii. Signs with video animation are only allowed for regional shopping malls.

        iii. Signs with video animation must be used to designate the entrance of a building.

        iv. Only one sign with video animation is allowed per regional shopping mall.

(19) Sign Area means the area of a sign that is used for display purposes, excluding the minimum frame and supports.  In computing sign area, only one side of a back-to-back or double face sign covering the same subject shall be computed when the signs are parallel or diverge from a common edge by an angle of not more than 45 degrees.  Where a sign has more than two faces, the area of the third face and all additional faces shall be included in determining the area of the sign.  In relation to signs that do not have a frame or a separate background, sign area shall be computed on the basis of the least rectangle, triangle or circle large enough to frame the specific area.

(20) Sign, Changeable Copy means a sign which is characterized by changeable copy whether the sign is free-standing or a wall sign, or whether the said projects from and is supported by a building.

(21) Sign, Director means a sign identifying two or more persons, agencies or establishments located in a place or location common to all.

(22) Sign, Electronic Message means a permanent freestanding, roof, wall, ground or low profile sign which changes copy electronically using a switch and electric lamps.

(23) Sign, Wall means a sign erected parallel to and attached to the outside wall of a building and extending not more than 24 inches from such wall with messages or copy on the face side only.

(24) Sign, Flood-Lighted means a sign made legible in the absence of daylight by devices which reflect or project light upon it.

(25) Sign, Gasoline Pump Island Canopy means a permanent sign attached or made part of the vertical edge of the canopy not exceeding the height of four feet or twice the height of the canopy edge, whichever is lesser.

(26) Sign, Pole means a sign supported by a fixed permanent frame or support in the ground.  This definition does not include monument signs.

(27) Sign, Identification means a sign displayed to indicate the name or nature of buildings or uses other than commercial or industrial uses located upon the premises, i.e., school, churches, hospitals, etc.

(28) Sign, Illuminated means a sign which has characters, letters, figures, design or outlines illuminated by electric lights or luminous tubes as a part of the sign proper.

(29) Sign, Awning means a fireproof sign architecturally integrated with the building which has the appearance of an awning consisting of light fabric materials.  Such signs may contain copy on any portion of the awning surface and may or may not include illumination.

(30) Sign, Interior means a sign located within a building so as to be visible only from within the building in which the sign is located.

(31) Sign, Monument, as defined in this Title, means an "on-premise" or freestanding identification sign erected with its base on the ground with no visible support structure.

(32) Sign, Mobile means an on-premise sign having a medium to heavy frame that is not permanently affixed to the ground.  Such signs include those commonly called "A" frame, pedestal, trailer, etc.

(33) Sign, Name Plate means a sign indicating the name and/or occupation of a person or persons residing on the premises or legally occupying the premises, or indicating a home occupation legally existing on the premises.

(34) Sign, Billboard or Off-premise means an advertising sign which directs attention to a use, product, commodity or service not related to the premises.

(35) Sign, On-premise means the category of signs which direct attention to a use conducted, product or commodity sold or service performed upon the premises on which it is located.

(36) Sign, Park Identification means a sign displayed to identify a specific group of businesses located within a business park setting.

(37) Sign, Political means a sign used in behalf of candidates for public office or measures on election ballots solely for the purpose of a local, regional or national election.

(38) Sign, Projecting means a sign attached to a building or other structure and extending in whole or in part more than 24 inches beyond any wall of the building or structure.

(39) Sign, Property means a sign related to the property upon which it is located and offering such property for sale or lease, or advertising contemplated improvements, or announcing the name of the builder, owner, designer or developer of the project, or warning against trespassing.

(40) Sign, Public Necessity means a sign informing the public of any danger or hazard existing on or adjacent to the premises.

(41) Sign, Roof means a sign erected partly or wholly on or over the roof of a building, including ground signs that rest on or overlap a roof 12 inches or more.

(42) Sign, Service means a sign which is incidental to a use lawfully occupying the property upon which the sign is located and which sign is necessary to provide information to the public, such as direction to parking lots; location of restrooms; and which bear, as an incidental part of the sign, the name, address or trademark of persons furnishing such sign to the owner of the premises.  No permit is required.

(43) Sign, Temporary on or off-premise, as regulated by this Title, shall include any sign, banner, pennant, valance, feather, flag, streamer, balloon, window sign, inflatable or advertising display constructed of paper, vinyl or plastic, cloth, canvas, light fabric, cardboard, wall board or other light materials, with or without light frames, intended to be displayed out of doors or in windows for a short period of time.

(44) Sign, Painted Wall means a sign either painted on a wall or is painted in such a way that it gives the visual appearance of being painted on a wall or facing by not having a frame or separation from the wall or facing.

(45) Structure means anything constructed or erected which requires location on or below the ground.

(46) Unsafe or Dangerous Sign means those signs existing in violation of any provision of the Uniform Building Code or Fire Code or other ordinances of this City.

(47) Yard means a space on a lot, unoccupied and unobstructed from the ground upward by buildings, except as otherwise provided herein.

(48) Yard, Front means a space on the same lot with a building between the front line of the building and the front lot line, and extending across the full width of the lot.  The depth of the front yard is the minimum distance between the front lot line and the front line of the building.

(49) Yard, Rear means a space on the same lot with a building between the rear line of the building and the rear lot line and extending the full width of the lot.  The depth of the rear yard is the minimum distance between the rear lot line and the rear line of the building.

(50) Yard, Side means a space on the same lot with a building between the side line of the building and the side lot line and extending from the front yard to the rear yard.  The width of the side yard shall be the minimum distance between the side lot line and the side line of the building.

(51) Zoning Administrator means the appropriate staff person(s) of the City or his designee employed by the City having the Title of Zoning Administrator.

**(Ord. No. 90-47 Amended 01/07/1991; Ord. No. 97-49 Amended 09/09/97; Ord. No. 01-50 Amended 07/03/2001; Ord. No. 04-39 Amended 08/17/04; Ord. No. 06-05 Amended 01/24/2006; Ord. No. 07-53 Amended 11/20/2007; Ord. No. 08-39 Amended 09/10/2008; Ord. No. 10-19 Amended 07/12/2010; Ord. No. 12-39 Amended 09/25/2012)**

# CHAPTER 11-2
# APPLICATION OF REGULATIONS

Sections:
11-2-101.        Conformity of Signs.
11-2-102.        Construction Standards.
11-2-103.        Maintenance.
11-2-104.        Issuance of Permits.
11-2-105.        Improper Issuance.
11-2-106.        Site Plan.
11-2-107.        Sign Permit Fees.
11-2-108.        Signs Exempt from the Permit Requirements of this Title.
11-2-109.        Signs Exempt From These Regulations.

## 11-2-101.    CONFORMITY OF SIGNS.

Except as provided in this Title, no sign shall be erected, raised, moved, placed, reconstructed, extended enlarged or altered, except in conformity with the regulations herein specified for the zoning district in which it is located.

## 11-2-102.    CONSTRUCTION STANDARDS.

All signs, hereinafter erected in the City, shall comply with the current standards of the National Electrical Code, the Uniform Building Code, all provisions of this Title and the Zoning Ordinance of the City.

## 11-2-103.    MAINTENANCE.

Every sign shall be kept in good repair and properly maintained by the owner.  This includes the replacement of defective parts, repainting, cleaning and other acts required for proper maintenance. The ground space within a radius of 10 feet from the base of any ground sign shall be kept free and clear of all weeds, rubbish and flammable material.  The City shall inspect and enforce this Section as specified in this Title.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-2-104.    ISSUANCE OF PERMITS.

It shall be unlawful for any person, whether acting as owner, occupant or contractor, or otherwise to erect, construct, reconstruct, enlarge, locate or alter any sign within the City contrary to any provisions to this Title, and/or where required without first obtaining site plan approval for such sign and a sign permit from the City.  The Community Development Director or his designee shall be empowered to:

   (1)  Issue permits to construct, alter or repair signs which conform to the provisions of this Title; and

(2) Ascertain in conjunction with the Zoning Administrator and Building Inspector that all sign, constructions and reconstructions or modifications of existing signs are built or constructed in conformance with the applicable rules, regulations, and codes.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-2-105.    IMPROPER ISSUANCE.

All designees shall comply with the provisions of this Title in issuing permit for signs. Any permit issued for a sign which is in conflict with any provisions of this Title shall be null and void, whether or not the permit was issued by an employee of the City authorized to issue the permits.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-2-106.    SITE PLAN.

(1) All applications for sign permits shall be accompanied by plans consisting of a site plan and elevation drawing. Two copies of the site plan on a minimum 8-1/2 x 11 inch paper shall be submitted. The site plan information shall be drawn approximately to scale, shall have accurate dimensions, and shall convey sufficient information so that the City can determine whether the proposed sign will conform with the provisions of this Title. Where a new development is contemplated, this information shall be submitted with the development application.

(2) Specifically, the site plan shall show the size of the sign and its location in relation to the following features of the site:
    a. Property lines, length of street frontage;
    b. Existing and proposed buildings or other structures;
    c. Curb cuts;
    d. Parking area; and
    e. The location and size of existing signs.

(3) Elevation drawings shall demonstrate, to the satisfaction of the City, reasonable design compatibility between the building and the sign and reasonable color schemes. Specifically, the elevation drawings shall show:
    a. Type of sign, as defined in definition section of this Title;
    b. Sign materials, colors, lighting, etc.;
    c. Sign height; and
    d. Sign dimensions.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-2-107.    SIGN PERMIT FEES.

(1) The owner and/or persons having charge or control of any sign, as described and authorized by the ordinances of the City, shall pay the City a fee for such sign.

(2) The amount of the sign permit fee shall be based upon the consolidated fee schedule.

(3) Where work for which a permit is required by this Title is initiated prior to obtaining said permit, all fees that should have been charged shall be doubled, due to the additional on-site inspections and difficult plan reviews required, but the payment of such double fee shall not

relieve any persons from fully complying with the requirements of this Title in the execution of the work, nor from any other penalties prescribed herein.

**(Ord. 01-50 Amended 07/03/2001)**

## 11-2-108.   SIGNS EXEMPT FROM THE PERMIT REQUIREMENTS OF THIS TITLE.

The following types of signs shall be exempt from the permit requirements of this Title:
(1) Property sign, as discussed in 11-5-101(1);
(2) On-site service sign;
(3) Political sign;
(4) Name plate sign;
(5) Temporary signs; and
(6) Public necessity sign.

**(Ord. No. 08-39 Amended 09/10/2008)**

## 11-2-109.   SIGNS EXEMPT FROM THESE REGULATIONS.

The following types of signs shall be exempt from the provisions of these regulations, but not from requirements normally associated with the building permit process:
(1) Any sign erected and maintained pursuant to and in discharge of any governmental function or required by any law, ordinance or governmental regulation;
(2) Signs being manufactured, transported and/or stored within the City limits shall be exempt; provided however, that such signs are not used, in any manner or form, for purposes of advertising at the place or places of manufacture or storage;
(3) Commemorative plaques of recognized historical societies and organizations;
(4) Religious symbols, legal holiday or special event decorations, and identification emblems of religious orders or historical societies;
(5) Signs located within malls, courts, arcades, porches, patios and similar areas where such signs are not visible from any point on the boundary of the premises;
(6) Signs on licensed commercial vehicles, including trailers; provided however, that such vehicles shall not be utilized as parked or stationary outdoor display signs within 40 feet of the ROW of a street;
(7) Signs on vehicles regulated by the City that provide public transportation, including, but not limited to, buses and taxicabs;
(8) Art or art forms which do not contain or imply any advertising message for a business; and
(9) Searchlights for temporary advertising purposes.

**(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 06-21 Amended 03/28/2006)**

# CHAPTER 11-3
# ENFORCEMENT

Sections:
11-3-101.     Legal Action.
11-3-102.     Violations and Penalty.
11-3-103.     Appeal of Staff Decisions.
11-3-104.     Appeal of Board of Adjustment Decisions.
11-3-105.     Appeal Fees.

## 11-3-101.    LEGAL ACTION.

The Community Development Director or his designee shall be empowered to institute any appropriate action or proceeding in any case where any sign is erected, constructed, reconstructed, altered, repaired, converted or maintained, or used in violation of any City Ordinance, including, but not limited to, the Zoning Ordinances and Uniform Building Code.  The purpose of such action shall be to: Prevent such unlawful erection, construction, reconstruction, alteration, repair, conversion, maintenance or use; and Restrain, correct or abate such violation.  Legal actions may include the following:

(1) Issue citations and/or swear out complaints against violators of this Title or cause such citations or complaints to be issued;

(2) Impound illegal signs and assess an impound fee for their return; or

(3) The City will issue a notice of violation to the person having charge, control or benefit of any sign found to be unsafe or dangerous, or in violation of any City Ordinance.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-3-102.    VIOLATIONS AND PENALTY.

Any person, whether acting as owner or occupant of the premises involved, or contractor, or otherwise who violates or refuses to comply with any of the provisions of this Title, shall be guilty of a Class "B" misdemeanor.  A separate offense shall be deemed to be committed on each day that the offense occurs or continues.  Violations may result in the following actions:

(1) If an unsafe or dangerous sign is not repaired or made safe within five working days after giving said notice, the City may abate and remove said sign, and the person having charge, control or benefit of any such sign shall pay to the City within 30 calendar days, after written notice is mailed to such person, the costs incurred in such removal.

(2) If an illegal sign is not made conforming within 30 calendar days after giving said notice, the City may remove said sign, and the owner or person having charge, control or benefit of any such sign shall pay to the City, within 30 calendar days after written notice is mailed to such person, the costs incurred in such removal.  Failure to pay shall be deemed a Class "B" misdemeanor.

(3) Each non-maintained sign shall be removed from the building or premises when such sign has not been repaired or brought into compliance by the owner, person having control, or person receiving benefit from such structure within 30 calendar days after notice of non-maintenance is given to the owner, person having control, or person receiving benefit from such structure.

(4) Signs located in or within 10 feet of the public right-of-way, and determined to be in violation of the provisions of this Title, may be impounded at any time.

**(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 06-06 Amended 01/24/2006)**

## 11-3-103.   APPEAL OF STAFF DECISIONS.

Appeal may be made to the Board of Adjustment from any decision, determination or requirement made by City staff by filing with the Community and Economic Development Department a notice thereof in writing within 10 days after such decision, determination, or requirement is made. Such notice shall set forth in detail the action and grounds upon which the property owner or other interested persons deems himself aggrieved.  In such determinations, competitive disadvantage or economic hardship shall not be considered as sufficient reasoning to grant an appeal.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-3-104.   APPEAL OF BOARD OF ADJUSTMENT DECISIONS.

The appellant may appeal any decision of the Board of Adjustment to the District Court. Such appeal shall be made within 30 days of the rendering of a decision by the Board of Adjustment.

## 11-3-105.   APPEAL FEES.

Fees for processing applications before the Board of Adjustment shall be charged.  Such fees shall be set by the City on an annual basis.

# CHAPTER 11-4
# GENERAL SIGN REQUIREMENTS

Sections:

11-4-101.        Signs not to Constitute a Traffic Hazard.
11-4-102.        Projection of Signs.
11-4-103.        Height of Signs.
11-4-104.        Height Exception for Freeway-oriented Pole Signs.
11-4-105.        Minimum Clearance of Signs.
11-4-106.        Signs on Public Property.
11-4-107.        Repair of Building Facade.
11-4-108.        Repealed.
11-4-109.        Signs in Conjunction with Conditional Uses.
11-4-110.        Lights and Lighted Signs.
11-4-111.        Criteria for Bonus Sign Area.
11-4-112.        Repealed.
11-4-113.        Prohibited Signs.
11-4-114.        Maintenance of a Clear View at an Intersection.
11-4-115.        Signs on Utility Poles, Street Trees and Street Name Poles.
11-4-116.        Sign Landscaping.
11-4-117.        Measurement of Setback.

## 11-4-101.    SIGNS NOT TO CONSTITUTE A TRAFFIC HAZARD.

No sign or other advertising structure shall be erected at the intersection of any streets in such a manner as to obstruct free and clear vision; or at any location whereby reason of the position, shape or color, it may interfere with, obstruct the view of, or be confused with any authorized traffic sign, signal or device, or which makes use of the words "STOP," "YIELD," "DANGER" or any other words, phrases, symbol or character in such manner as to interfere with, mislead or confuse traffic.

## 11-4-102.    PROJECTION OF SIGNS.

Signs shall be allowed to project from buildings or structures in conformance with the following provision:

Wall Signs attached to the face of a nonconforming building, located on or near the property line, with no copy visible from the sides may be allowed to extend two feet into the public right-of-way where no vehicular interference is anticipated.

(Ord. No.  01-50 Amended 07/03/2001; Ord. No. 08-39 Amended  09/17/2008)

## 11-4-103.    HEIGHT OF SIGNS.

The height of signs shall be in conformity with the following provisions:

(1)  Pole signs shall maintain the height limitations as specified in the various zones described
      subsequently in this Title, except for freeway-oriented pole signs in Commercial or

Manufacturing districts within 660 feet of a freeway, or within 1500 feet of an exit providing access to the premises on which the sign is located, as specified in this Title.

(2) Projecting signs will be allowed to extend even with the peak or highest roof line or parapet wall of a building.  When a building has more than one level, the wall on which the sign is installed will govern.

(3) Wall signs against buildings or other structures will be allowed to extend 2 feet above the roof lines or parapet wall of a building.  When a building has more than one level, the wall on which the sign is installed will govern.

**(Ord. 01-50 Amended 07/03/2001)**

# 11-4-104.    HEIGHT EXCEPTION FOR FREEWAY-ORIENTED POLE SIGNS.

Any freeway-oriented pole sign within 660 feet of a freeway ROW, including billboards, may extend to 25 feet above the grade of the adjacent freeway or 65 feet above the ground, whichever is higher.  Freeway-oriented pole signs shall meet the front yard minimum setback of 30 feet from the property line.

**(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 07-53 Amended 11/20/07)**

# 11-4-105.    MINIMUM CLEARANCE OF SIGNS.

Where vehicular or pedestrian traffic is anticipated, there shall be a minimum clearance of 10 feet between the ground or sidewalk, and any part of a projecting sign or pole sign that projects into any required yard space, with the exception of monument signs, property signs, public necessity signs, service signs and name plates.  The minimum clearance for a projecting sign over privately-owned traveled ways is 14 feet, where service delivery trucks are anticipated.

**(Ord. No. 01-50 Amended 07/03/2001)**

# 11-4-106.    SIGNS ON PUBLIC PROPERTY.

(1) Except as explicitly authorized by City ordinance, no sign, placard, advertisement, or handbill shall be erected or posted on City-owned property or in City rights-of-way.  Any such sign, placard, advertisement, or handbill may be removed immediately by the City.

(2) Any person who violates the provisions of this Chapter is guilty of a class "B" misdemeanor.

(3) The provisions of this Section may be enforced as set forth in Chapter 11-3 of the City Code.

**(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 08-39 Amended 09/17/2008; Ord. No. 14-33 Amended 08/03/2014)**

# 11-4-107.    REPAIR OF BUILDING FACADE.

A damaged building facade, resulting from the removal, repair, replacement or installation of any signs, shall be repaired by the property owner within 30 calendar days from the date of said damage.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-4-108.    REPEALED.

**(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 08-39 Repealed 09/17/2008)**

## 11-4-109.    SIGNS IN CONJUNCTION WITH CONDITIONAL USES.

Whenever application is made for a conditional use permit, the applicant shall include details of any sign(s) to be erected on the premises described in the conditional use permit application. In reviewing the application, the Planning Commission shall consider the character of the surrounding parcels and the sign's compatibility with the architecture, materials, and colors of the associated building.  The Commission shall either approve, apply conditions to, or deny the application in accordance with their findings.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-4-110.    LIGHTS AND LIGHTED SIGNS.

All spotlights, floodlights or lighted signs shall be in-stalled so that the light is directed away from adjoining uses, especially residential uses.

**(Ord. No. 01-50 Amended 07/03/2001)**

## 11-4-111.    CRITERIA FOR BONUS SIGN AREA.

To encourage design excellence, the Planning Commission may increase the maximum sign area and/or height for certain signs, as set forth in this Title, by the square footages or percentages as provided for herein.  A separate bonus may be granted for compliance with each of the criteria listed below.  Although each area is cumulative, the total percentage of increase cannot be greater than 20 square feet in area and 2' in height for monument or pole signs and 5 percent for wall signs.

(1)  The size of pole signs and monument signs may be increased as follows:

    a.  10 square feet in area and one foot in height when the sign is installed in a landscaped area four times the area of the sign;

    b.  10 square feet in area and one foot in height when a pole sign is removed and is replaced with a monument sign;

    c.  5 square feet and 6 inches in height when all signs in a commercial complex are designed with similar lettering, backgrounds and materials;

    d.  5 square feet and 6 inches in height when brick or rock columns are used as a vertical support;

    e.  5 square feet and 6 inches in height when the sign has a unique overall design;

    f.  10 square feet in area and one foot in height when an existing sign must be relocated due to a governmental action such as a roadway widening which results in a minimal setback area for the sign;

    g.  An applicant may submit an alternative sign plan or design for unique and special circumstances, provided such sign(s) achieves the intent of the above standards and this Ordinance.

(2)  Wall signs may be increased in size as follows:

a.  5 percent when all lettering and background is uniform in style and color for signs in a shopping center or for any three distinct establishments which are located under the same roof.

(Ord. No. 90-47 Amended 01/07/1991; Ord. No. 01-50 Amended 07/03/2001; Ord. No. 10-19 Amended 07/12/2010)

## 11-4-112.   REPEALED.

(Ord. No. 05-50 Amended 12/6/2005; Ord. No. 08-39 Repealed 09/17/2008)

## 11-4-113.   PROHIBITED SIGNS.

The following signs are expressly prohibited by this Title:

(1) Any mobile sign located on the property or within a building or vehicle, such as an "A" frame, trailer sign or pedestal-type sign is prohibited;

(2) Any display of merchandise within 20 feet of a public right-of-way unless reviewed and approved by the West Valley City Planning Commission, where the display of merchandise shall be a minimum of 10 feet from the public right of way, or if located within and adheres to the standards in the City Center Zone; and

(3) Signs containing or utilizing animation, excluding electronic message sign animation, as defined in Section 11-1-104(16) of this Title.

(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 05-50 Amended 12/6/2005; Ord. No. 08-39 Amended 09/17/2008)

## 11-4-114.   MAINTENANCE OF A CLEAR VIEW AT AN INTERSECTION.

(1) A clear view area at the intersection of two streets shall be maintained within a triangular area formed by a diagonal line connecting lines at the top back of the curbs 40 feet from the projected intersection of such curb lines.  To maintain this clear view no visual obstructions between two and seven feet in height from the street elevation, as measured from the elevation of the adjoining sidewalk, shall be allowed.

(2) A clear-view area shall also be maintained at the intersection of a street and a private drive within a triangular area formed by a diagonal line connecting the line of the curb of the street and the line of the edge of the private drive at points 20 feet from the projected intersection of such lines.  In order to maintain this clear view, the standards outlined in subsection 1 above shall apply.

(Ord. No. 02-19 Amended 03/19/2002; Ord. No. 05-50 Amended 12/6/2005))

## 11-4-115.   SIGNS ON UTILITY POLES, STREET TREES AND STREET NAME POLES.

To insure safe access for maintenance or emergency services by the various companies using utility poles and to promote consistency along the streetscape, signs shall only be located on utility poles with utility's written permission.  Signs shall be prohibited from street trees, traffic regulatory sign poles and street name poles.

West Valley City Municipal Code

Title 11 – Sign Ordinance

**(Ord. No. 05-50 Amended 12/6/2005)**

## 11-4-116 SIGN LANDSCAPING.

When required, such landscaping shall conform to the following provisions:

(1) Sign landscaping shall not include any of the minimum required site landscaping.

(2) The sign landscaping shall contain at least 50% live plant material.

(3) The landscaping shall have a slope no greater than one to four.

(4) If a berm or planter box are used as part of the landscaped area the height of the berm or planter box shall not exceed two feet.

(5)  Alternative landscape materials and designs may be considered by the Planning Commission as a Conditional Use.

**(Ord. No. 10-19 Enacted 07/12/2010)**

## 11-4-117 MEASUREMENT OF SETBACK.

The sign setback shall be measured from the property line.

**(Ord. No. 10-19 Enacted 07/12/2010; Ord. No. 12-24 Amended 6/18/2012)**

# CHAPTER 11-5
# SPECIFIC SIGN REGULATIONS

Sections:

11-5-101.        Miscellaneous Signs.
11-5-102.        Temporary on-premise Signs.
11-5-103.        Monument Signs.
11-5-104.        Roof Signs.
11-5-105.        Billboards.
11-5-106.        Pole Signs.
11-5-107.        Electronic Message Signs.
11-5-108.        Wall Signs.

## 11-5-101.    MISCELLANEOUS SIGNS.

(1) Flags with permanent anchors and/or foundations may be located in all zones. Flags shall be approved by the Planning Commission through the Conditional Use process. These flags shall generally not be located within 20 feet of the front property line, unless approved otherwise by the Planning Commission.

(2) Local, State, Federal Government Flags with permanent anchors and/ or foundations may be erected in all zones. These flags shall not be located within 10 feet of the front property line, unless it is approved by the Planning Commission through the Conditional Use process. The flag should never be used for advertising purposes in any manner whatsoever. Advertising signs shall not be fastened to a staff or halyard from which the flag is flown as per United States "Flag Code" Section 36.10.176. Flags shall be displayed in accordance with the United States "Flag Code" Section 36.10.176.

(3) Newspaper and printed material stands and advertisement on bus benches and/or at bus or transit stops shall be prohibited unless a franchise agreement is entered into with West Valley City. Newspaper and printed material stands shall be limited to a maximum of one (1) stand per transit stop. Stands may have more than one paper receptacle but shall have no more than eight (8) receptacles. Stands shall be located a minimum of ten (10) feet from the curb and shall not block pedestrian movement where a minimum of five feet of walkway width shall be required for pedestrians. Stands shall only be permitted at transit stops on City property, unless located within a building.

(4) On-site service signs may be erected for the purpose of facilitating or controlling the efficient or safe movement of pedestrians or vehicles on or into private property, and shall be located on the properties on which they pertain.  Such signs may include incidental identification type advertising but shall not exceed 16 square feet.  No sign permit shall be required.

(5) In addition to a monument sign, apartment units of five or more dwelling units may erect one wall sign on the premises to identify only the name of the apartment complex and to indicate a vacancy. Said sign shall not exceed an area of 32 square feet.

(6) One nameplate or marker shall be allowed for each dwelling to indicate the occupant's name. Said nameplate shall not exceed two square feet in area, and may contain an occupational designation.

(7) On-Site Light Pole Signs shall be allowed in the General Commercial (C-2), Transitional Commercial (C-3), and Manufacturing (M) zones. Such signs shall not be located within 20 feet of the front property line. Each light pole shall have a maximum of two banner signs. No light pole shall be erected unless the primary purpose of the light pole is to provide light in parking areas. A maximum of twelve (12) square feet of banner signage shall be allowed per light pole. Signs shall be placed on the light pole via a permanent support structure meant for the placement of a sign where such signs shall hang taut. Signs shall be constructed and maintained with durable materials in a professional manner.



**(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 08-39 Amended 09/10/2008)**

## 11-5-102.    TEMPORARY ON-PREMISE SIGNS.

Temporary signs shall conform to the following provisions. Illumination is prohibited for temporary signs unless specified otherwise. Businesses shall be permitted one temporary sign unless specified otherwise below. A building façade shall have a maximum of 30% temporary sign coverage at any time.  Business owners shall be responsible for meeting all sign standards of this chapter.



(1) Additional Business Sign for Road Widening Construction
   a.  Zoning Restrictions. Applicable in all zones.
   b.  Size. Any such sign shall not exceed an area of 50 square feet.
   c.  Setback. Such signs may be permitted on private property but shall not obstruct any pedestrian sidewalks, vehicular drives or clear-view at intersections.
   d.  Time Limitations. Any such sign shall be temporary in nature and shall be permitted only during a City, Utah Department of Transportation, or Utah Transit Authority managed road widening or transit project. Signs shall be removed once the construction has ceased or there is sufficient work done to install a permanent sign, whichever is earlier.

     e.   Number. One temporary sign may be used in addition to any other permitted temporary sign.

     f.   Other Regulations. Temporary signs listed as prohibited in this chapter shall not be permitted for Road Widening Construction Signs. Banners shall be the only type of temporary sign allowed for this use.

(2) Banner Sign – Used to advertise for a business and does not act as the primary business sign.

     a.   Zoning Restrictions. B/RP, C-1, C-2, C-3, M, MXD, RB, RM.

     b.   Setback. Banners shall not be placed within 20 feet of the front property line, and should be located on the outside building face. Banners shall not be located on fences.

     c.   Size. The maximum size shall be 50 square feet of temporary sign area. Tenant spaces larger than one hundred fifty (150) linear feet may use a maximum of 10% of the front building facade.

(3) Banner Sign - Used to promote a business name as the primary business wall sign.

     a.   Zoning Restrictions. B/RP, C-1, C-2, C-3, M, MXD, RB, RM.

     b.   Setback. Where a new business is in need of temporary signage, a banner sign may be placed on the building and shall act as the primary business sign(s). Shall be located on the front elevation of the place of business.

     c.   Size. This temporary sign shall be limited to the wall sign sizes as permitted in the applicable zone.

     d.   Time Limitation. This sign may be used for a maximum of 90 days after the business has obtained a business license, or until a permanent sign is mounted on the building, whichever is less.

(4) Construction Project Signs.

     a.   Zoning Restrictions. Commercial and Manufacturing Zones.

     b.   Size. Not exceeding 96 square feet

     c.   Lighting. Signs may utilize external lighting, but may not be internally lighted.

     d.   Time Limitation. All signs shall be removed within 30 days after final inspection of the last building in the project.

     e.   Setback. All such signs shall be setback at least 10 feet from any public or private right-of-way.

     f.   Height. Freestanding signs shall not exceed 12 feet in height.

     g.   Number. One on-site sign per street frontage may be erected in conjunction with a construction project. Through the conditional use process, the Planning Commission may approve more than one on-site sign in the City Center Zone, on properties adjacent to a freeway, or on properties that are five acres or larger.

     h.   Materials. Shall not be built with paper materials, and shall be constructed in a professional manner.



(5)  New Development Signs used for any new development in any zone
    a.  Zoning Restrictions. In all zones.
    b.  Size. A maximum area of 32 square feet
    c.  Time Limitations. Signs shall be removed no later than 30 days following the completion of the project.
    d.  Setback.  Signs shall be set back 10 feet from the right-of-way of any public street. In addition, a minimum spacing of 50 feet shall be maintained between such signs.
    e.  Number. A maximum of two development signs may be placed off-site and shall require a letter of consent from the property owner.
    f.  Materials. Shall not be built with paper materials, and shall be instructed in a professional manner.



(6)  Flags that are used in allegiance to local, state, or federal government
    a.  Zoning Restrictions. In all Zones.
    b.  Setback. Shall not be located within 20 feet of the front property line and shall be maintained in accordance with the United States "Flag Code" regulations. Flags may be located in the park strip and/or the front yard setbacks area on National or State Holidays except during inclement weather or at night.
    c.  Number. Maximum 3 flags per business or dwelling unit and shall be in accordance with United States "Flag Code".  There shall be no limitation in the number of flags permitted on National or State Holidays.
    d.  Advertisement. The US flag shall not be used for advertising purposes in any manner whatsoever. Advertising signs shall not be fastened to a staff or halyard from which the flag is flown. As per United States "Flag Code" Section 36.10.176.
    e.  Other. Flags shall be displayed in accordance with the United States "Flag Code" Section 36.10.176.



(7)  Grand-Opening Signs
   a.  Zoning Restrictions. In all Zones.
   b.  Setback. Shall be located on the subject property. Shall not be located in the traffic clear-view area. Shall not block or be located on any public or private sidewalk unless located in the City Center Zone and adheres to the regulations of the City Center Zone.
   c.  Type of Signs. Businesses may use any type of temporary sign during this period.
   d.  Time Limit. Shall be displayed for a maximum of thirty (30) days from the issuance date of a business license.
   e.  Other. The renewal of a business license, change of ownership, or change of name alone shall not authorize the use of grand-opening signs. Grand-opening signs shall be allowed for any new business who obtains a new business license.  A facility renovation requiring a building permit will quality for grand-opening signs.

(8)  Inflatable Signs
   a.  Zoning Restrictions. General Commercial (C-2), Transitional Commercial (C-3), and Manufacturing (M) zones.
   b.  Setback. Shall not be located within 20 feet of the front property line.
   c.  Time Limit. Inflatable signs may be displayed for a maximum of thirty (30) days per calendar year.  Each display shall continue for a minimum of five (5) days.
   d.  Height. The height of an inflatable sign shall not exceed the height of any adjacent raised utility lines
   e.  Permit. A permit shall be required for inflatable signs.
   f.  Other. Inflatable signs shall be secured and in direct contact with the ground.



(9)  Merchandise Display
   a.  Zoning Restrictions. General Commercial (C-2), Transitional Commercial (C-3), and Manufacturing (M) zones.
   b.  Setback. Shall not be located within 20 feet of the front property line. Shall leave a minimum of four (4) feet wide unobstructed private and public right-of-way sidewalk area for pedestrian movement. Shall not be located in any parking space.
   c.  Inclusions. Merchandise shall include any product or good that is proposed for sale or lease; and shall include any product or good that is exhibited for the purposes of advertisement.
   d.  Exception. Display of merchandise within the required setbacks or in the public right-of-way is prohibited unless reviewed and approved by the West Valley City Planning Commission through Conditional Use Approval. Merchandise display in the City Center Zone may be permitted within 20 feet of the front property line and shall meet the regulations of the City Center Zone ordinance.



(10) New Subdivision and Home Sales Signs
    a.  Zoning Restrictions. In all zones.
    b.  Size. For subdivisions which include five or more lots, major promotional signs, not exceeding one 64 square foot sign for each builder, may be used. The total area of all such signs shall not exceed 128 square feet. Individual phases of a subdivision shall not be considered separate subdivisions. No single sign shall exceed 64 square feet. Subdivisions which include five or more lots may attach one wall sign to one model home for each builder in the subdivision. This sign shall not exceed 32 square feet in area. One stationary open house sign may be used for each model home. Such signs may state the name of the builder, purchase terms, and/or the hours when the model will be open, among other things. This sign shall not exceed 16 square feet in area.
    c.  Setback. All subdivision signs shall be set back a minimum of five feet from any public or private right -of-way.
    d.  Height. No freestanding sign shall exceed 12 feet in height.
    e.  Time Limitations. All signs shall be removed within 30 days after final inspection of the last home in the subdivision.
    f.  Other Regulations. Mobile signs are prohibited. Signs may utilize external lighting but shall not be internally lighted.



(11) Open House Signs
    a.  Zoning Restrictions. Open House signs advertising real estate open for inspection for a prospective sale may be placed on the subject property.
    b.  Setback. On-Premise Open House signs shall be located a minimum of five (5) feet from the public right-of-way.
    c.  Size. Such signs may state the name of the person or firm sponsoring the open house. Such signs shall not exceed eight square feet in area.
    d.  Off-Premise. A maximum of four (4) off-premise open house signs shall be permitted per open house event. Such signs shall be displayed for a maximum of eight (8) hours in one day.



(12) Other Temporary Signs
    a.  Setback.  Temporary signs shall not be allowed within 20 feet of the front property line.
    b.  Other Regulations. Non-business oriented banners whose sole intent is to promote festivals, holidays, seasons, or other community events are excluded from the provisions of this ordinance.

(13) Political Signs. Political signs relating to the nomination or election of any individual for public office or advocacy of any issue to be voted upon at any special or general election shall be allowed under the following conditions:
    a.  Zoning Restrictions. In all zones.
    b.  Size. Any such sign shall not exceed an area of 16 square feet in a residential zone.
    c.  Other Regulations. Such signs shall neither be constructed nor fastened in such a way as to cause a hazard to the public.



(14) Prohibited Temporary Signs
      a.  A-frame signs are prohibited except if located in and as regulated in the City Center Zone.
      b.  Any mobile sign located on the property or within a building or vehicle, trailer sign, metal stand, or pedestal-type sign is prohibited;
      c.  Off-premise temporary signs are prohibited except as defined in 11-102(5).
      d.  Feathers and flags used for advertising are prohibited.
      e.  Streamers or pennant-type streamers are prohibited.
      f.  Any temporary sign attached to any other sign, fence, light/power pole, or structure not built and intended for support of such sign. Signs, fences, light/power poles, and structures that are intended to support temporary or permanent signs shall be reviewed through a building permit and shall adhere to sign regulations in this title.
      g.  Exceptions. Any type of sign may be used during a Grand-Opening, as defined in this Chapter.



West Valley City Municipal Code

Title 11 – Sign Ordinance

(15) Sale, Rent, or Lease Signs
- a.  Zoning Restrictions. In all zoning districts, signs may be erected to advertise the sale, rent or lease of property upon which said signs are placed.
- b.  Setback. Signs shall be located on premise on the subject property.
- c.  Size. Signs shall not exceed an area of eight square feet in residential zones or 32 square feet in nonresidential zones.
- d.  Number. Said signs shall be limited to one sign per street frontage.



(16) Vehicle Signs
- a.  Zoning Restrictions. In all commercial (C) and manufacturing zones.
- b.  Setback. Signs on vehicles or in the back/bed of trucks shall be located a minimum of 40 feet from the street.
- c.  Size. Applies to commercial vehicles with signs larger than four square feet.
- d.  Other Regulations. Such vehicles shall not be used as parked or stationary outdoor display signs.



(17) Window Signs
    a. Zoning Restrictions. All non-residential zones.
    b. Size. A maximum of 50% coverage of all windows shall be permitted for advertisement, including store hours, per business. Where paint or marker is used on the window, the area shall be measured by creating a square around the message and calculating that square footage in relation to the square footage of the window area. Where one window is completely covered in window signs, another window of equal or greater size shall be left free of any advertisement.
    c. Location. Inside or outside of the business windows.
    d. Exceptions. Windows used to meet the Commercial Design Standard Ordinance, as a design treatment, and are backed by a wall where pedestrians cannot by floor plan and building design see through the window into the business, may use murals, fogged glass, spandrel glass, and/or window treatments, but shall not utilize any additional signage or advertisements for the business in the window(s).



**(Ord. No. 98-74 Amended 01/04/1999; Ord. No. 08-39 Amended 09/10/2008; Ord. No. 09-05 Amended 2/26/2009; Ord. No. 14-33 Amended 08/03/2014)**

# 11-5-103    MONUMENT SIGNS.

Monument signs, as defined in this Title, shall be allowed in all Agricultural, Multifamily, B/RP, RB, Commercial and Manufacturing zones, provided that:

(1) For signs less than or equal to five feet in height measured from final grade, a minimum setback from the public right-of-way of five feet is required.  For signs greater than five feet in height, a setback equal to the sign's height is required, unless this requirement is specifically limited by the appropriate zone;

(2) Such signs shall be incorporated into a landscaped area that is at least twice the area of the sign, unless little flexibility exists on the site and a waiver is granted by the Zoning Administrator or designee;

(3) Such signs shall generally maintain a 100 foot separation from all other signs and 50 feet from the side and rear property lines that are not adjacent to a public right-of-way.   In situations with minimal frontages where very little flexibility in sign placement exists, less stringent standards may apply as determined by the Zoning Administrator or designee;

(4) Such signs shall be limited to 50 square feet in area for signs up to six feet in height and an additional 10 square feet of area may be added for every additional foot in height over six feet;

(5) Such signs shall be limited to one monument sign per 200 feet of frontage.  Properties that have more than one frontage may have at least one (1) sign per frontage if there is a cumulative total of 200 feet of frontage or at least 100 feet of frontage per street frontage, whichever is greater.

(6)  Electronic message signs shall be limited to one sign per frontage. This requirement may be waived by the Planning Commission through the issuance of a conditional use permit; however no more than one sign per 200 feet of frontage shall be permitted.

(7)  Such signs shall contain no animation.

(8)  Such signs shall be 6 feet in height for single tenant signs, and 7 feet in height for multi-tenant signs, unless specifically limited by the appropriate zone.

(9)  Exposed poles up to one third of the height of the sign may be considered by the Planning Commission through the Conditional Use process.  The exposed poles must be architecturally compatible with the building in color, material and design.

(10) The base of such signs shall be limited to 50% of the area of the sign.

(11) The base of such signs shall be masonry, which may include brick, stone or stucco.  If stucco is used it shall match the color of the associated building and include additional decorative architectural elements such as caps, columns or other decorative features.



(12) The base of such signs shall be equal to or greater in size than the total horizontal dimension of the sign face.

(13) Such signs shall include a non-advertising masonry base with a minimum height of one (1) foot.

**(Ord. No. 01-50 Amended 07/03/2001; ; Ord. No. 01-77 Amended 12/18/2001 Effective date 12/20/2001.; Ord. No. 01-77 Amended 03/06/2002;  Ord. No. 04-17 Amended 03/16/2004; Ord. No. 04-27 Amended 06/01/2004; Ord. No. 06-05 Amended 01/24/2006; Ord. No. 07-53 Amended 11/20/2007; Ord. No. 10-19 Amended 07/12/2010)**

## 11-5-104.    ROOF SIGNS.

Roof signs, as defined in this Title, shall be allowed in all Commercial and Manufacturing zones, provided that:

(1)  Roof signs shall not project above the roofline of the building on which it is located.

(2)  Roof signs shall be installed or erected in such a manner that there is no visual support structure.

(3)  Animated roof signs are prohibited, excluding electronic message sign animation.

(4)  Roof signs shall be limited in area on the face or façade of a building or structure. Signs shall be a maximum of 10 percent of the front first (defined as the actual first story height or 15 feet whichever is less) story face and five percent of any other first story face. Fifteen percent of the front story face may be allowed, if no pole signs are requested. Where a wall sign is present on

the building or structure façade, a roof sign shall be prohibited; where a roof sign is present on the building or structure façade, a wall sign shall be prohibited.

**Ord. No. 01-50 Amended 07/03/2001; Ord. No. 08-39 Amended 09/10/2008; Ord. No. 10-19 Amended 07/12/2010)**

# 11-5-105.   BILLBOARDS.

(1) Purpose.  It is the purpose and intent of this Section to limit the number of billboards to the total number of existing billboards. This Chapter further provides for the reasonable regulation of billboards with the intent of limiting negative impacts, enhancing the aesthetics of existing billboards and implementing goals and policies promoting safety, the protection of property values, aesthetics, the maintenance of gateways, views and vistas that enhance the City, and further the applicable elements of the City's General Plan.

(2) Cap.  The number of billboards allowed in the City shall be limited to the number of billboards that are existing in the city as of January 31, 2003 (53).  This cap shall automatically decrease as billboards are removed but not relocated.

(3) Location.  Billboards shall only be allowed in "C-2," "C-3," and "M" zones.  Billboards shall not be allowed in gateway-oriented overlay zones, regardless of the underlying zone.

(4) Size.  Billboards shall not exceed 672 square feet in "M" zones along freeways.  Billboards shall not exceed 300 square feet in "C-2," "C-3" and non-freeway oriented "M" zones.

(5) Separation.  The minimum distance between billboards shall be 750 radial feet along freeways and 500 radial feet at any other location.

(6) Height.  The maximum height of a billboard shall be 35 feet, except for freeway-oriented signs as specified in this Title.  The maximum height when located within 150 feet of a residential zone or use shall be 25 feet, and such signs shall contain no illumination.

(7) Setbacks.  The minimum front yard setback shall be 10 feet for billboards less than or equal to 25 feet in height.  Signs exceeding 25 feet in height shall be set back one additional foot for each foot of height over 25 feet, up to the maximum height allowed of 35 feet.  The sign setback shall be measured from the property line.  The closest edge of a billboard shall not project into any required setback area.  The minimum separation between a  billboard and any residential use or zone boundary shall be 75 feet.

(8) Lighting.  Lighting shall be confined to the sign face and not illuminate the night sky.

(9) Design.   Billboards shall utilize the "monopole" or "bi-pole" design and shall be continuously maintained structurally and on the copy face.

(10) Removal.  Prior to the removal of any billboard the owner shall obtain a permit for the demolition of the billboard.  Permits may be provided following application to the Community and Economic Development Department.

(11) Relocation.   The owner of an existing billboard may remove the existing billboard from a non-conforming site to an approved location only after a permit is obtained as set forth in this Title and other provisions of this Chapter are complied with.  Billboards moved to approved locations shall conform to all sign requirements of the new location.  Billboards moved from non-conforming locations must be installed to a new approved location within eighteen (18) months from the date the permit is issued with not more than one extension of six months granted by the Community and Economic Development Department.  If the billboard is not moved in this time frame the ability to relocate said billboard is forfeited.

(12) Relocation of conforming billboards.  Billboards that conform to the provisions of this Ordinance may be relocated as follows:

    a.   When road widening or development proposals force the need to relocate;

    b.   When a conforming billboard is removed, for whatever reason, that sign may be relocated to a conforming location only when the company that owns the sign at the time of removal, has either removed all of that company's nonconforming signs or relocated all of that company's non-conforming signs to conforming locations, shall contain no illumination.

(13) Electronic Message Signs. Electronic message signs shall be a maximum of 300 square feet if located on a billboard that is not freeway oriented and shall not increase in size if the existing billboard is less than 300 square feet prior to electronic message sign installation. Electronic message signs located on billboards shall be regulated as defined in Section 11-5-107, and shall be separated by 500 radial feet from any other electronic message sign located on a billboard.

**(Ord. No. 93-27 Amended, 12/13/1993; Ord. No. 01-50 Amended 07/03/2001; Ord. No. 03-22 Amended 03/25/2003; Ord. No. 05-50 Amended 12/6/2005; Ord. No. 07-53 Amended 11/20/2007; Ord. No. 12-24 Amended 06/18/2012)**

## 11-5-106.    POLE SIGNS.

Pole signs, as defined in this Title, shall be allowed in all Agricultural, Multifamily, B/RP, RB, Commercial and Manufacturing zones, provided that:

(1) All single pole signs shall include a solid cover that encompasses the pole.  Such covers shall be architecturally integrated with the sign and adjacent building.  A minimum width of two feet is recommended but the intent is to evaluate the pole width in relationship with the sign.  Pole signs constructed with two poles may substitute an architecturally integrated base.  Freeway oriented pole signs in excess of 30 feet in height are exempt.  Billboards are exempt.

(2) Clearance shall be a minimum of 10 feet between the bottom of the sign face and the ground where vehicular or pedestrian traffic is anticipated.  Pole signs adjacent to freeways may extend 25 feet above the freeway pavement grade or 65 feet above ground, which ever is higher.

(3) The minimum front yard setback shall be 10 feet for signs less than or equal to 15 feet in height. Signs exceeding 15 feet in height shall be set back one additional foot for each foot of height over 15 feet up to the maximum height allowed in the zone.

(4) Separation between pole signs and any other signs shall follow the standards for monument signs as described in this Title.

(5) Pole signs shall be limited to one sign per frontage. However, this requirement may be waived for freeway oriented signs as a conditional use through the Planning Commission.

(6) All pole signs, except freeway oriented pole signs over 35 feet, shall incorporate pole covers.

(7) All pole signs shall be incorporated in a landscaped area that is at least equal to twice the area of the sign.

(8) All pole signs shall be architecturally compatible with the building style, colors, and/or materials.

(9) The area limitation for a pole sign (excluding billboards) shall not exceed one square foot of sign area for every lineal foot of the frontage occupied by the use for which the sign is intended.  The maximum pole sign area shall be 200 square feet unless this requirement is waived through review and approval of a sign plan to the Planning Commission as part of a conditional use or a new conditional use.

(10) All pole signs, except billboards, shall be processed as Conditional Uses and shall only be allowed on properties encompassing at least 10 acres.  Interior lots may have one pole sign and one billboard subject to the provisions of this Ordinance.

(11) Projection of pole signs is permitted into the setback area to a maximum of three feet.

(Ord. No. 01-50 Added 07/03/2001; Ord. No. 10-19 Amended 07/12/2010)

## 11-5-107.   ELECTRONIC MESSAGE SIGNS.

(1) Electronic message signs are permitted in the C-2, C-3, and M zones when inlaid in a monument, pole, freeway oriented billboard, or wall sign with the following regulations:

    a.  Electronic message signs shall be incorporated into a monument, wall, freeway oriented billboard, or pole sign.

        i.  An electronic message sign incorporated on a wall or billboard sign may occupy up to 100% of the entire sign face. Wall signs shall be limited to one electronic message sign per building elevation. Wall signs shall be limited to 10% coverage of the front elevation of the building, regardless of whether a pole sign exists on the property or not.

        ii.  An electronic message sign incorporated into a pole sign shall not occupy more than 50% of the entire sign face. Freeway oriented pole signs may have 100% electronic message sign coverage of the sign and are not required to be turned off at night.

        iii.  An electronic message sign incorporated into a monument sign shall not occupy more than 50% of the entire sign face for a monument sign.

    b.  Electronic message signs shall adhere to all the height and setback regulations for the sign on which the electronic message sign is located.

    c.  Electronic message signs shall be located a minimum of 100 feet from any residential boundary. Electronic Message Signs located on Billboards that are not freeway oriented shall be located a minimum of 200 feet from any residential boundary. In situations where a billboard, that is an electronic message sign, is obstructed from residential view, the Zoning Administrator may reduce the minimum setback from a residential boundary via an Administrative Determination.

    d.  Lumination during the day for full color electronic message signs shall not exceed 6000 cd/m2 or NITs. Lumination during the night for full color electronic message signs shall not exceed 1500 cd/m2 or NITs. Full color electronic message signs shall be dimmed to a maximum of 1500 cd/m2 or NITs from 10 o'clock pm to 6 o'clock am. Lumination during the day for monochrome color electronic message signs shall not exceed 3000 cd/m2 or NITs. Lumination during the night for monochrome color electronic message signs shall not exceed 500 cd/m2 or NITs. Monochrome color electronic message signs shall be dimmed to a maximum of 500 cd/m2 or NITs from 10 o'clock pm to 6 o'clock am. Electronic message signs shall also be set with a photo-cell dimmer to automatically dim with ambient light changes.

    e.  Lumination shall be set and locked with an access code prior to or at the time of installation of the electronic message sign. The lumination settings shall not be changed or altered at any time for the duration of the electronic message sign's life, unless approval from West Valley City has been granted in writing.

    f.  Building permits for electronic message signs shall require the sign plans to be stamped certifying the percent of brightness the sign is set to prior to approval.

    g.  Off premise advertising is prohibited, except in the case of billboards.

    h.  Community messages are permitted on the electronic message sign, including:

        i.  Time

        ii.  Date

        iii.  Weather/Temperature

        iv.  Government Service Announcements (e.g. amber alert)

        v.  Traffic Information

(2) Electronic message signs are permitted in the RB, B/RP, and C-1 zones when inlaid in a monument, freeway oriented billboard, or wall sign with the following regulations:

    a.  Electronic message signs shall be incorporated into a monument, wall, or freeway oriented billboard sign.

        i.  An electronic message sign incorporated on a wall or freeway oriented billboard sign may occupy up to 100% of the entire sign face. Wall signs shall be limited to one electronic message sign per building elevation. Wall signs shall also be limited to 10% coverage of the front elevation of the building, regardless of whether a pole sign exists on the property or not.

        ii.  An electronic message sign incorporated into a pole sign shall not occupy more than 50% of the entire sign face. Freeway oriented pole signs may have 100% electronic message sign coverage of the sign and are not required to be turned off at night.

        iii.  An electronic message sign incorporated into a monument sign shall not occupy more than 50% of the entire sign face for a monument sign.

    b.  Electronic message signs shall adhere to all the height and setback regulations for the sign on which the electronic message sign is located.

    c.  Electronic message signs are not permitted in the RB zone unless the parcel has at least five (5) acres of property.

    d.  Electronic message signs shall be located a minimum of 100 feet from any residential boundary. Electronic Message Signs located on Billboards that are not freeway oriented shall be located a minimum of 200 feet from any residential boundary. In situations where a billboard, that is an electronic message sign, is obstructed from residential view, the Zoning Administrator may reduce the minimum setback from a residential boundary via an Administrative Determination.

    e.  Electronic message signs shall automatically terminate any and all energy that may allow the electronic message center sign to light up (creating 0 cd/m2 or NITs) from 10 o'clock pm to 6 o'clock am.

    f.  Lumination during the day for full color electronic message signs shall not exceed 6000 cd/m2 or NITs. Lumination during the night for full color electronic message signs shall not exceed 0 cd/m2 or NITs. Full color electronic message signs shall be dimmed to a maximum of 0 cd/m2 or NITs from 10 o'clock pm to 6 o'clock am. Lumination during the day for monochrome color electronic message signs shall not exceed 3000 cd/m2 or NITs. Lumination during the night for monochrome color electronic message signs shall not exceed 0 cd/m2 or NITs. Monochrome color electronic message signs shall be dimmed to a maximum of 0 cd/m2 or NITs from 10 o'clock pm to 6 o'clock am. Electronic message signs shall also be set with a photo-cell dimmer to automatically dim with ambient light changes.

    g.  Building permits for electronic message signs shall require the sign plans to be stamped certifying the percent of brightness the sign is set to prior to approval.

    h.  Off premise advertising is prohibited, except in the case of billboards.

    i.  Community messages are permitted on the electronic message sign, including:

        i.  Time

        ii.  Date

        iii.  Weather/Temperature

        iv.  Government Service Announcements (e.g. amber alert)

v.   Traffic Information

(3) Electronic message signs are prohibited in windows in all zones.

(4) If the electronic message portion of a pole or monument sign is desired to be larger than that permitted, an application may be filed for a conditional use for review by the planning commission.

**(Ord. No. 07-53 Added 11/20/2007)**

## 11-5-108.   WALL SIGNS.

Wall signs, as defined in this Title, shall be allowed in all Agricultural, Multifamily, B/RP, RB, Commercial and Manufacturing zones, provided that:

(1) The area limitation for signs on the face of a building or structure, unless specifically limited by the appropriate zone, shall be 10 percent of the front first story face (defined as the actual first story height or 15 feet whichever is less) and five percent of any other first story face. Fifteen percent of the front story face may be allowed, if no pole signs are requested. Canopies shall be considered structures.

(2) Painted signs on walls of buildings are permitted with approved professionally prepared designs. Maximum size regulations may be exceeded with Planning Commission approval.

(3) Signs on multi-story buildings shall maintain consistent style and architectural compatibility with the building.

**(Ord. No. 10-19 Enacted 07/12/2010)**

# CHAPTER 11-6
# SIGN REQUIREMENTS BY ZONING DISTRICT

Sections:

11-6-101.        Residential and Agricultural Districts.
11-6-102.        Residential Business.
11-6-103.        Commercial "C-1" District.
11-6-104.        Commercial "C-2" and "C-3" Districts.
11-6-105.        Business/research Park District.
11-6-106.        Manufacturing "M" District.

## 11-6-101.      RESIDENTIAL AND AGRICULTURAL DISTRICTS.

Signs in this district are subject to all general regulations set forth in this Title and to the following additional requirements:

(1) Only the following signs are allowed in residential and agricultural districts:
   a.   Name plates;
   b.   Public necessity signs;
   c.   Property signs;
   d.   Monument signs, for uses other than home occupations;
   e.   Identification signs;
   f.   Service signs;
   g.   Conditional use signs and multiple dwelling unit identification;
   h.   Development promotional, and off-site directional signs;
   i.   Political signs; and
   j.   Temporary signs.

(2) These signs shall conform to the following provisions:
   a.   One non-illuminated nameplate for each dwelling unit, not exceeding two square feet in area, indicating the name of the occupant and/or an approved home occupation;
   b.   One or more public necessity signs not exceeding 24 square feet in combined total area for each commercial or residential use lawfully occupying the premises, provided that no one sign shall exceed 8 square feet in area;
   c.   Monument signs shall not exceed 5 feet in height;
   d.   One or more service signs not exceeding 16 square feet per sign for each commercial, residential or agricultural business use lawfully occupying the premises.

**(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 08-39 Amended 09/10/2008; Ord. No. 10-19 Amended 07/12/2010)**

## 11-6-102.      RESIDENTIAL BUSINESS.

Signs in this district are subject to all general regulations set forth in this Title and to the following additional requirements:

(1) Only the following signs are allowed in the Residential Business District:
   a.   Awning signs;
   b.   Monument signs;
   c.   Wall signs;

       d.   Illuminated signs;
       e.   Name plates;
       f.   Property signs; and
       g.   Public necessity signs.
       h.   Electronic message signs.

(2)  These signs shall conform to the following provisions:

       a.   The area limitation for signs on building or structure faces shall be five (5) percent of any face of the building, which is defined as the actual first story height or 15 feet, whichever is less.
       b.   Monument signs shall not exceed 5 feet in height.

(3)  Signs shall be compatible with existing or proposed architecture in terms of scale, color and design.

**(Ord. No. 01-50 Amended 07/03/2001; Ord. No. 04-04 Amended 1/20/2004; Ord. No. 10-19 Amended 07/12/2010)**

# 11-6-103.    COMMERCIAL "C-1" DISTRICT.

Signs in this district are subject to all general regulations set forth in this Title and to the following additional requirements:

(1)  Only the following signs are allowed in a "C-1" district:

       a.   All signs allowed in residential districts as specified in this Title.
       b.   Monument signs.
       c.   Wall Signs.
       d.   Electronic Message Signs.
       e.   Projecting Signs.
       f.   Roof Signs.
       g.   Temporary on premise signs.
       h.   Illuminated awning signs.
       i.   Gas pump island canopy signs.

**(Ord. No. 90-47 Amended 01/07/1991; Ord. No. 01-50 Amended 07/03/2001; Ord. No. 06-05 Amended 01/24/2006; Ord. No. 07-53 Amended 11/20/2007; Ord. No. 10-19 Amended 07/12/2010)**

# 11-6-104.    COMMERCIAL "C-2" AND "C-3" DISTRICTS.

Signs in these districts are subject to all general regulations set forth in this Title and to the following additional requirements:

(1)  Only the following signs are allowed in "C-2" and "C-3" districts:

       a.   All signs allowed in "C-1" districts as specified in this Title;
       b.   Billboards;
       c.   Pole Signs;

(2)  These signs shall conform to the following provisions:

       a.   The maximum height of a pole sign shall be 25 feet above the grade of the front sidewalk or property line.

**(Ord. No. 90-47 Amended 01/07/1991; Ord. No. 91-05 Amended 04/18/1991; Ord. No. 93-27 Amended 12/13/1993; Ord. No. 01-50 Amended 07/03/2001; Ord. No. 06-05 Amended 01/24/2006;**

Ord. No. 07-53 Amended 11/20/07; Ord. No. 08-39 Amended 09/10/2008; Ord. No. 10-19 Amended 07/12/2010)

# 11-6-105.   BUSINESS / RESEARCH PARK DISTRICT.

Signs shall be compatible with the approved architectural theme of the business park.  Signs shall be subject to all general regulations set forth in this Title and to the following additional requirements:

(1)  Only the following signs are allowed in a "Business/Research Park" district:
   a.  Monument;
   b.  Park identification;
   c.  Wall signs; and
   d.  Electronic Message Signs.

(2)  These signs shall conform to the following provisions:
   a.  Monument signs shall not exceed five feet in height and shall be located no closer than 10 feet from the street;
   b.  Park identification sign(s) shall be allowed with permission from the Planning Commission; and
   c.  Wall signs shall not exceed 10 percent of the front first story face (defined as the actual first story height or 15 feet, whichever is less) and five percent of any other face. Canopies shall be considered structures.
   d.  Park identification signs shall be located as determined by the Planning Commission.

(Ord. No. 90-10 Amended 02/14/1990; Ord. No. 01-50 Amended 07/03/2001; Ord. No. 07-53 Amended 11/20/2007; Ord. No. 10-19 Amended 07/12/2010)

# 11-6-106.   MANUFACTURING "M" DISTRICT.

Signs in this district are subject to all general regulations set forth in this Title and to the following additional requirements:

(1)  Only the following signs are allowed in the "M" district:
(2)  All signs as allowed in "C-2" and "C-3" districts as specified in this Title.
(3)  These signs shall conform to the following provisions:
   a.  The maximum height of a pole sign shall be 35 feet above the grade of the front sidewalk or property line.
   b.  Corner or double-frontage lots/commercial complexes may choose two on-premise signs (one per frontage) and one off-premise sign, if so desired.

(Ord. No. 90-47 Amended 01/07/1991; Ord. No. 91-05 Amended 04/18/1991; Ord. No. 93-27 Amended 12/13/1993; Ord. No.  01-50 Amended 07/03/2001; Ord. No. 06-05 Amended 01/24/2006; Ord. No. 07-53 Amended 11/20/2007; Ord. No. 10-19 Amended 07/12/2010)

# CHAPTER 11-7
# NONCONFORMING SIGNS

Sections:

11-7-101.        Alterations.
11-7-102.        Restoration.
11-7-103.        Maintenance.
11-7-104.        Abandonment.
11-7-105.        Repealed.

## 11-7-101.    ALTERATIONS.

A nonconforming sign shall not be altered, reconstructed, raised, moved, placed, extended, or enlarged, unless said sign is changed so as to conform to all provisions of this Title. All alterations shall require conformance to the provisions of this Ordinance including any physical changes to the sign panel or the sign cabinet itself.  Face changes in multi-tenant signs, freeway-oriented pole signs, normal maintenance/repair, and copy changes in signs previously approved by the City with a changeable copy feature are excluded. Further exclusions include any architectural enhancements to existing multi-tenant pole signs in conjunction with a building façade remodel.  The building façade remodel must be at least 25% of the front façade of the building.  Overall height, size, and shape of the sign shall not be increased.  Any sign that is located within or projects into the existing public right-of-way shall be made conforming when an alteration occurs.

**(Ord. No. 90-47 Amended 01/07/1991; Ord. No. 01-50 Amended 07/03/2001; Ord. No. 04-39 Amended 08/17/04; Ord. No. 06-06 Amended 01/24/2006; Ord. No. 08-62 Amended 12/29/2008)**

## 11-7-102.    RESTORATION.

Nonconforming signs which have been allowed to deteriorate or which have been damaged by fire, explosion, act of nature, or act of a public enemy, or damaged by any other cause, to the extent of more than 50 percent of its assessed value shall, if repaired or rebuilt, be repaired or rebuilt in conformity with the regulations of this Title.

**(Ord. No. 90-47 Amended 01/07/1991)**

## 11-7-103.    MAINTENANCE.

Minor repairs and maintenance shall not necessitate conformance to the requirements of this Title.

## 11-7-104.    ABANDONMENT.

Within 60 days after vacation of a tenant or for signs lacking advertisement for a period of 60 days or more, any on-premise non-conforming sign shall be removed or brought into compliance by the property owner.  If removal does not occur voluntarily, after appropriate notice, as specified in Subsection 11-3-102(3), the entire sign and support structure shall be taken down by the owner or may be removed by the City and all costs incurred shall be the responsibility of the property owner.

West Valley City Municipal Code                                    Title 11 – Sign Ordinance

(Ord. No. 01-50 Added  07/03/2001; Ord. No. 06-06 Amended 01/24/2006)

## 11-7-105.    REPEALED.

(Ord. No. 01-50 Added 07/03/2001; Ord. No. 01-77 Amended 12/18/2001, Effective date 12/20/2001;
Ord. No. 04-39 Amended 08/17/04; Ord. No. 06-06 Repealed 01/24/2006)